Julio **HUERTAS**; Carmen Melendez; Francisco Garcia; Rosaria Esperon; Raphael Negron; Angelo Vasquez; Maria Sanchez; Joyce Johnson; Betty Robinson, individually and on behalf of all other persons similarly situated; Lower East River Joint Planning Council on Housing; It's Time, Inc., Appellees,

v.

**EAST RIVER HOUSING CORP.**; Seward Park Housing Corp.; Hillman Housing Corp.; Amalgamated Dwelling, Inc., Appellants.

No. 665, Docket 92–7848.

United States Court of Appeals, Second Circuit.

Argued March 10, 1993.

Decided May 12, 1993.

Nathan Lewin, Washington, DC (Miller, Cassidy, Larroca & Lewin, Washington, DC; Alan G. Blumberg, and Szold & Brandwen, New York City, on the brief), for appellants.

Kenneth Kimerling, New York City (Puerto Rican Legal Defense & Educ. Fund, Inc., on the brief), for appellees.

Before: TIMBERS, KEARSE, and PRATT, Circuit Judges.

TIMBERS, Circuit Judge:

Appellants, housing corporations, appeal from an order entered in the Southern District of New York, Robert L. Carter, *District Judge,* requiring them to accept applications and to maintain a waiting list for apartments which were the subject of a housing discrimination action and a stipulated settlement. Appellants ceased accepting new applications just months after the settlement agreement went into effect. They claim that accepting applications is not a requirement of the settlement agreement, and that they are not violating the terms of the agreement.

For the reasons that follow, we affirm.

## I.

We summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

A class action was filed in 1977 against appellants, four moderate-income cooperative housing developments on the Lower East Side of Manhattan, alleging housing discrimination. These cooperatives consist of the East River Housing Corp., the Seward Park Housing Corp., the Hillman Housing Corp., and Amalgamated Dwellings, Inc. Appellants denied that there was any discrimination.

A class of plaintiffs was certified representing:

"(a) all Puerto Rican, other Hispanic and Black homeseekers who have completed or will complete applications for occupancy in the cooperative apartments owned by the defendants and who have been or may be denied the opportunity to purchase those apartments because of their national origin or race; and

(b) all Puerto Rican, other Hispanic and Black homeseekers who have had or will have interest in buying a cooperative apartment owned by defendants but have been discouraged and dissuaded from completing an application to do so by any act of defendants prohibited by 42 U.S.C. §§ 1981 and 1982 and/or by 42 U.S.C. §§ 3601–3619."

Order of the court, dated March 6, 1978 (Carter, J.). A non-jury trial began in February 1981. In December 1981, after months of post-trial motions and memoranda, the court urged the parties to settle.

A settlement was agreed upon orally in January 1985. Over the next six months the parties and court negotiated certain details. One of the issues which caused a problem was the payment of attorney's fees. Despite the disagreement over fees, the court ruled that the proposed settlement was binding and awarded appellees' attorney's fees. Appellants appealed from the district court order. A panel of this Court vacated and remanded because the order bound appellants to a settlement containing a provision to pay attorney's fees to which they had not agreed. 813 F.2d 580 (2 Cir.1987) (per curiam). On remand, the court made a factual finding of a pattern and practice of racial discrimination by appellants in allocating their apartments 674 F.Supp. 440, 441 (S.D.N.Y.1987). The court filed an opinion on July 2, 1987 which contained these findings of discrimination and which ordered implementation of the aforementioned settlement agreement. The court also ordered appellants to pay appellees' attorney's fees. Appellants filed a notice of appeal. Appellees filed a cross-appeal.

Settlement discussions resumed. The parties entered into a new Stipulation of Settlement ("settlement agreement"), which was substantially similar to the previous one. The settlement agreement, which by its terms would be effective for an eight year period from 1987–1995, directed that vacant apartments be allocated according to racial quotas during the period of the agreement. The terms of the settlement agreement also recalled the opinion of the district court dated July 2, 1987, and vacated the judgment of the court. The settlement agreement was approved and entered as an order of the court on June 14, 1988.

Four months later, in October 1988, appellants stopped accepting applications for apartments, asserting that the waiting list was long enough to fill all possible vacancies during the remainder of the period covered by the agreement. This was the first time in decades that the applications were closed. Appellees moved to compel appellants to reopen the application process, citing concern over the period after the settlement provisions will have been fulfilled.

Appellants replied to the motion by asserting that, under the settlement thus far, appellants had met or exceeded all minority quotas in the allocation of apartments. Also, there were four times as many minority applicants on the waiting list as possibly could be allocated apartments during the remaining period of the settlement. The composition of the list was not racially discriminatory. Moreover, at the end of the settlement period, the apartments could be sold on an individual basis by the current occupants; then the waiting list would be irrelevant. Appellants also asserted that opening the application process would create a stampede and would raise unrealistic expectations about the availability of apartments.

The court found that, while the settlement agreement itself did not expressly require maintaining a waiting list, it did explicitly proscribe the adoption of new rules or procedures in the application process which would be discriminatory. The court therefore held that freezing the application process would constitute a discriminatory type of procedure; as such, it would be a violation of the settlement agreement, since it would freeze

past discrimination contained in the waiting list.

## II.

Appellants appeal from the court's interpretation of the settlement agreement and from its order to reopen the application process. They assert that they have "rigorously and painstakingly carried out every letter and spirit" of the settlement. They claim that Blacks and Hispanics have filled apartment vacancies at percentages equal to or exceeding the quotas set forth in the settlement agreement. They advance four arguments which they believe require reversal of the court's order.

They maintain that the settlement agreement does not explicitly require appellants to continue to accept applications and the court cannot interpret the agreement to include a requirement which was not negotiated by the parties.

They assert that, even if an obligation to accept applications and to maintain a list can be inferred as a term of the agreement, the current list is sufficient to cover the remaining period during which the settlement agreement will be effective.

They argue that, by ordering the reopening of the application process, the court erroneously relied on the court's previous factual determination that the waiting list was infected by discrimination; but this was vacated by acceptance of the settlement agreement. The court announced these findings in its July 1987 opinion which was recalled once the parties agreed to enter into the settlement agreement. Appellants urge that the findings set forth in that opinion provide no basis for the conclusion that the list is now infected; those findings were vacated and the appeals from that opinion were dismissed.

They also argue that the reason for reopening the application process—to have a list which could be used after the eight year period—is unsound because there is no legal duty or obligation for owners of housing (who are not subject to a legal settlement) to maintain a waiting list for applications.

We shall address each of appellants' arguments seriatim.

(A) *Requirement of an Application Process*

 Settlement agreements are to be discerned within the four corners of the agreement *United States v. Armour & Co.,* 402 U.S. 673, 681–82 (1971); *United States v. International Bhd. of Teamsters,* 978 F.2d 68, 73 (2 Cir.1992); *United States v. O'Rourke,* 943 F.2d 180, 187 (2 Cir.1991). Courts should not go beyond the terms of the agreement when interpreting it. As the reviewing court, it is our task to interpret the agreement *de novo.* *O'Rourke, supra,* 943 F.2d at 186; *United States v. International Bhd. of Teamsters,* 931 F.2d 177, 182 n. 1 (2 Cir.1991). We must determine whether the court properly reopened the application process for the cooperatives, or whether, through its order, it overstepped its authority by adding terms which were not contemplated by the parties in reaching the settlement agreement. For the reasons set forth below, we hold that the court's order did not reach beyond the spirit and terms of the agreement.

The settlement agreement between the cooperatives and the certified class does not contain a specific requirement that appellants keep the application process open, or even that they maintain an applicant list. Indeed, it allows appellants to adopt "new application rules or procedures, that are lawful, do not violate any of the terms and conditions of this Stipulation and are applied uniformly to all applicants regardless of race or ethnicity ... [and] that do not discriminate on the basis of race or ethnicity." Appellants assert that since there is no showing of discrimination, their elimination of the application process is not prohibited by the settlement agreement. They argue that the order thus would impose a requirement on them which is beyond the scope of the agreement into which they voluntarily entered.

If that were the case, the order should not have been entered. As appellees assert, however, the court, in requiring appellants to keep the application process open and to maintain an applicant list, did not impose a duty on appellants which is outside the set-

tlement agreement. Rather, as appellees point out, the order to accept new applications and to maintain the list actually· was contemplated by the settlement agreement.

The agreement, taken in its entirety, requires appellants to remedy their past acts, one of which was discouraging minority applicants from applying for apartments. Part of the certified class consists of:

> "(b) all Puerto Rican, other Hispanic and Black homeseekers who have had or will have interest in buying a cooperative apartment owned by defendants *but have been discouraged and dissuaded from completing an application to do so by any act of defendants* prohibited by 42 U.S.C. §§ 1981 and 1982 and/or by 42 U.S.C. §§ 3601–3619."

Order of the court, dated March 6, 1978 (Carter, J.) (emphasis added). Moreover, a specific requirement of the settlement agreement was that appellants publish notice of the settlement in newspapers targeting minorities which stated that the settlement might affect a minority which was discouraged from applying for the apartments involved. Thus, the agreement was aimed at enabling these people now freely to apply for apartments in the cooperatives run by appellants.

Without departing from the "four corners" rule of *Armour, supra,* 402 U.S. at 681–82, a court may look to certain aids, such as the circumstances surrounding a settlement agreement's formation, when construing it for enforcement purposes. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238 (1975). The circumstances surrounding this settlement agreement included past disparity in the number of minorities to whom apartments were allocated. Amelioration of that disparity thus may be construed as the purpose of the settlement. Accomplishment of that purpose was the goal of the settlement. As the court stated, "certain of [the agreement's] provisions demonstrate that keeping the list open is essential to ensuring that all class members receive some form of relief under the agreement." By halting the application process, appellants effectively have precluded the agreed-upon remedy for the class of people who were "discouraged and dissuaded" from completing an application for an apartment operated by appellants.

The fact that this group was included in the class and was given notice suggests to us that a primary intent of the settlement agreement was to encourage and allow these people to *apply* for the apartments. The effectuation of this intent would be impossible if the application process were to remain closed. An entire class of plaintiffs would be precluded from receiving any relief to which it was entitled under the settlement agreement. Far from violating the spirit of the settlement agreement, by ordering appellants to keep the application process open, the court was assuring that the settlement agreement would be carried out, as there is no other way to provide a remedy to those who have been discouraged from applying for apartments.

(B) *Sufficiency of the Current Applicant List*

Appellants assert that, even if the settlement agreement were to impose a duty on them to maintain a waiting list, that duty would extend only as far as is necessary to meet the requirements of correcting the racial disparity in the apartment allocations in accordance with the settlement agreement. They claim that the list which was frozen in 1988 will be sufficient to allocate apartments through the end of the eight year period during which the settlement agreement will be effective. The list, at the time of the court's 1992 opinion, consisted of 2,428 applicants, 849 of whom were Black or Hispanic. Appellants assert that this number is more than four times larger than the number of apartments which were allocated under the settlement agreement during the first four years it was in effect (207 apartments were allocated to class members between September 1987 and June 1991). Appellants contend therefore that the applicant list, 35% of which are class members, is sufficient to meet the requirements of the settlement agreement.

It is irrelevant, however, that the list was comprised of a large number of class member applicants. A substantial purpose of the

settlement agreement was to dissipate the atmosphere of discrimination (even if there has been no admission or finding of discrimination) and to encourage minorities to apply for housing. That purpose cannot be achieved if the application process is closed. This is particularly true since applicants are not allocated apartments chronologically. A minority applicant who applies for an apartment today may get one before a white applicant who applied five years ago. This is significant in showing that keeping the application process open will encourage more minorities to apply.

### (C) *Finding of Racial Discrimination on the Waiting List*

Appellants also contend that the court's order is based on a clearly erroneous factual finding and therefore must be reversed. The opinion states that the waiting list, as it stands, is tainted by past discrimination because before the settlement agreement the discriminatory practices of appellants dissuaded minorities from submitting applications. Appellants challenge this characterization of their pre-settlement practices. They claim that they never admitted that they engaged in discriminatory practices and therefore the court's finding was not supported by any evidence. Indeed, the settlement agreement contains a disclaimer of liability or of violation of any law. The only evidence upon which the court could have based such a statement, according to appellants, was evidence heard during the trial in 1981 and referred to in the finding it made in its opinion in July 1987, the latter having been recalled later under the terms of the settlement agreement.

▄▄▄ Although appellees claim that the court was able to find past discrimination notwithstanding the disclaimer in the settlement agreement, we decline to circumvent the disclaimer provision at this time, and construe the settlement agreement as a contract. *Pharmaceutical Soc'y of New York, Inc. v. Cuomo*, 856 F.2d 497, 501 (2 Cir.1988). We must give effect to all the provisions agreed to by the parties. *City of Hartford v. Chase*, 942 F.2d 130, 135 (2 Cir.1991). Appellants assert that it would be absurd to conclude that any defendant who settles a case, even with a disclaimer of liability, actually is admitting liability. We need not reach this issue, since a finding of discrimination is not necessary in the instant case.

We do not base our conclusions on the court's characterization of the current waiting list as infected by the past discrimination of appellants. The agreement itself requires that the cooperative apartments *encourage* minority applications. That cannot be done if the application process is closed.

### (D) *Effect of Order on the Post–Settlement Period*

This brings us to appellants' contention that appellees' rationale for keeping the list open—to ensure conformity with the settlement agreement after the court's jurisdiction ceases in 1995—imposes a requirement on appellants which no other apartment owner has to meet. Appellants claim that they in effect would be required to meet a legal obligation that was not part of the settlement agreement. While appellants are correct in their assertion that after August 1995 (the expiration date of the settlement agreement), they will no longer be obligated to keep the application process open or maintain a waiting list, their present argument must fail. As stated above, acceptance of applications is necessary to purge past disparity from the waiting list. This is especially critical in view of the fact that applicants are not selected from the waiting list in chronological order.

We find it consistent with the spirit of the settlement agreement for appellants to continue accepting applications, thus encouraging minorities to apply for these apartments. The court did not err in ordering the reopening of the application process.

### III.

To summarize:

The court properly ordered appellants to continue accepting applications for their apartment complexes. Doing so did not go beyond the scope of the agreement; rather, it was necessary to effectuate the goal and purposes of the agreement. This opinion is not meant to alter the general rule that

courts cannot go beyond the four corners of a settlement agreement and add requirements and duties not contemplated by the parties who negotiated the agreement. Here, the court did not add terms to the agreement; it merely ordered the continuation of a process which is necessary to effectuate the settlement agreed to by all parties.

Affirmed.

GEORGE C. PRATT, Circuit Judge, dissenting:

In my view, the district court erred in ordering the reopening of the application process, because (1) maintaining an application process was not part of the settlement agreement, (2) defendants can easily comply with the terms of the settlement without accepting new applications, and (3) the goal of the agreement was to attain particular racial occupancy quotas and not, as the majority suggests, "to dissipate the atmosphere of discrimination * * * and to encourage minorities to apply for housing."

The majority's decision undermines the value of consent decrees as a means of resolving discrimination cases. If defendants cannot rely on the agreements they carefully negotiate, why should they settle at all? The parties in this case hammered out the terms of the settlement agreement over two lengthy intervals, both of which were closely supervised by Judge Carter. After the agreement was drafted, Judge Carter issued a notice of settlement and hearing to all class members. If plaintiffs had any objections to the terms of the agreement, they should have raised them at the June 10, 1988, hearing. When Judge Carter endorsed the settlement, however, he specifically noted that there were "no objections to the substance of the settlement."

If plaintiffs had wanted the application process to remain open for the duration of the settlement period, they could have sought to make it explicit in the agreement. As it stands, the agreement contains detailed provisions regarding the allocation of apartments according to racial background, but no requirement that defendants continue to accept applications until 1995.

The only mention of an application process is the following:

Nothing contained herein shall prevent the Cooperative from continuing to implement existing application rules or procedures, or adopting new application rules or procedures, that are lawful, do not violate any of the terms and conditions of this Stipulation and are applied uniformly to all applicants regardless of race or ethnicity * * *.

This provision clearly allows defendants to change the process, which is exactly what they did. Their new policy of not accepting applications applies uniformly to all, regardless of race or ethnicity, and violates neither the law nor any of the terms of the agreement. It is undisputed that defendants can easily meet all of the stipulation's requirements without accepting new applications, because the present list contains nearly four times as many active Puerto Rican, other Hispanic, and Black applicants as could foreseeably be allocated over the remaining period covered by the settlement. In November 1991, the defendants had a pool of 849 minority applicants from which to fill approximately 225 foreseeable spots until 1995, when the agreement ends.

Defendants have not violated the agreement in any way. The majority insists that the agreement "requires that the cooperative apartments *encourage* minority applications," but this is not the case. All that the agreement requires is that the defendants meet certain racial occupancy quotas until 1995. The fact that those discouraged from applying were originally included as a subclass "suggest[ed]" to the majority that "a primary intent of the settlement agreement was to encourage and allow these people to *apply* for the apartments." However, the settlement agreement and decree operate as much to curtail the subclass's interests as they do to advance them. The only purpose properly attributable to the agreement is that it was made to settle a disputed claim against the defendants of racial discrimination. Once that agreement was approved by the court, it became final and binding on all parties, no matter how it cut.

The majority refers to an "atmosphere of discrimination", while at the same time

recognizing that there is no evidence in the record to support a finding of discrimination. All prior findings were "bargained out" by the parties in the district court, and the agreement specifically provides that the defendants admit no liability or violations of law. By stating that the defendants had previously "discourag[ed] minority applicants from applying for apartments," the majority inserts its own appellate factfinding into the case and deprives defendants of the benefit of their bargain.

The settlement agreement, signed by the parties and approved by the court, should be honored by, and enforced against, all its parties. Defendants are holding up their end of the bargain as it was written; the district court should not be permitted to add a new term to the agreement favoring one subclass of plaintiffs.

I respectfully dissent.