Michael X. **HURLEY**, etc.,
et al., Plaintiffs,

and

Khalil A. **Rahman**, etc., et al.,
Plaintiffs–Intervenors,

v.

Thomas A. **COUGHLIN III**,
et al., Defendants,

and

**New York State Inspection, Security, and Law Enforcement Employees, District Counsel 82, AFSCME, AFL–CIO, etc., Defendants–Intervenors.**

No. 77 Civ. 3847 (RLC).

United States District Court,
S.D. New York.

July 28, 1993.

---

Prisoners Legal Services, Ithaca, NY (Sarah Betsy Fuller, of counsel) and Prisoners Legal Services, New York City (David C. Leven, of counsel), for plaintiffs.

New York University Civ. Rights Clinic, New York City, for plaintiffs-intervenors (Claudia Angelos, of counsel).

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for defendants (August L. Fietkau, Asst. Atty. Gen., of counsel).

ROBERT L. CARTER, District Judge.

I

A consent decree (see Appendix) was entered into in this case on July 21, 1983, over the signatures of one of the then Assistant Attorney Generals of the State of New York, counsel for the plaintiffs, David Leven, Esq.,

Prisoners' Legal Services of New York and counsel for the intervenors, Claudia Angelos, Esq., Washington Square Legal Services of New York. The decree was on behalf of a class consisting "of all inmates in the custody of the New York State Department of Correctional Services ["DOCS"] ... includ [ ] [ing] the subclass of Muslim inmates" in the state's custody. This settlement of the litigation came approximately ten (10) months after the court had filed its final opinion in the case in which it held that routine strip frisk searches could be required after contact visits but were unreasonable and unjustified in all other circumstances. *See Hurley v. Ward,* 549 F.Supp. 174 (S.D.N.Y.1982) (Carter, J). During that ten month interval the parties had engaged in intense negotiations, sometimes with the court's assistance, in an effort to work out a mutually acceptable solution, thereby concluding the lawsuit and avoiding the need and expense of an appeal. The result was the consent decree.

The decree states unequivocally that "defendants ... are hereby enjoined and restrained from requiring or permitting the strip frisking and/or strip searching of inmates in the custody of the [DOCS], except in accordance with the following provisions of this decree." Its basic purpose was to establish for DOCS standard operating procedures in the areas covered by the stipulated agreement, which were to be followed in every facility under defendants' control and in every circumstance once the procedures became operative.

The agreement defines a strip frisk as "a search of an inmate's clothes and body including body cavities. For a male this involves one or more of the following procedures: opening his mouth and moving his tongue up and down and from side to side, removing any dentures, running his hands through his hair, allowing his ears to be visually examined, lifting his arms to expose his arm pits, spreading his fingers to expose the areas between his fingers, lifting his feet, lifting his testicles to expose the area behind his testicles and bending and/or spreading the cheeks of his buttocks to expose his anus to the frisking officer. For females the pro-

cedure is similar except that females must squat to expose the vagina....."

The decree was the product of good faith bargaining. Both sides felt they had given up something which they could have secured with this court's decision or on appeal, but that resolving the controversy by a stipulated agreement was in the best interest of the state and the inmates. Both sides were committed to monitoring the agreement in good faith, according respect to their opposing views when disagreement arose concerning the implementation and interpretation of the decree, and seeking to work these differences out among themselves before involving the court in the dispute.

The implicit understanding and undertaking were that the Prisoners' Legal Services and the Washington Square Legal Services, now the NYU Legal Services, would advise DOCS and the Attorney General's office on receipt of verifiable violations of the terms of the agreement. On receipt of such information, DOCS and the Attorney General would make the necessary inquiry to determine whether the facility or facilities in question were in compliance with the consent decree. There is inevitable tension between these groups, but cooperation among them secured for a time a satisfactory supervision of the agreement's implementation at a minimum outlay of public funds. Certainly this procedure is not the most effective or most efficient measuring device, but when the parties approach the task in a spirit of mutual good faith and trust, it can, and did for a while, work reasonably well.

Isolated complaints from individual inmates, lacking support from either counsel for the plaintiffs or intervenors, did not as a rule invoke full scale inquiries by defendants. Such action was undertaken only when triggered by complaints supported by counsel for plaintiffs and/or counsel for the intervenors. Of course, the inmate could pursue the matter through the inmate's grievance machinery, but then the complaint would seldom get beyond the particular facility implicated.

In the last several years the atmosphere has changed. The reaction of the defendants to complaints of violations of the decree from counsel for the plaintiffs and intervenors has

been dismissive. There has been a complete erosion of mutual respect between the parties, and neither side now believes the other is acting in good faith. Court efforts to restore an atmosphere of cooperation and mutual respect have been unsuccessful. The court met with the parties in December, 1990, January, 1991, April, 1991, and May, 1993.

At the December, 1990 conference in response to a complaint about lack of posting of the consent decree, the state asserted as justification for this breach of the decree the growth of DOCS from 25 facilities and 25,000 inmates when the settlement was reached to 80 facilities and 60,000 inmates today. In response to plaintiffs' charges of multiple violations of the decree in terms of strip searches and strip frisks in the Special Housing Units [1] ("SHU") to SHU transfers, the presence of more than an officer and a supervisor when strip frisks were administered, and routine strip frisking by correction officers on admission to office of Mental Health ("OMH") facilities, defendants' alleged that no such violations had occurred. In addition, defendants asserted that the charges from plaintiffs and intervenors must have a very high degree of validation hereinafter before the state would be willing to take them seriously—in short, plaintiffs counsel's support of a claim no longer sufficed.

As to the OMH issue, DOCS admitted that its practice deviated from the terms of the consent decree which provides that, on admission to these units, medical personnel should determine whether a strip search or strip frisk should be administered and, if the decision is affirmative, medical personnel are to perform the task. In practice, the decision whether to undertake a strip search or frisk was being made by correction officers, and correction officers, not medical personnel, administered the strip searches and frisks. DOCS advised the court that this was the current practice because medical personnel deferred to the correction officials. In light of the assurance that there had been no violation of the decree, it seems apparent that defendants refused to accept the admit-

ted deviations from the decree as a transgression.

At the January, 1991 meeting, there was discussion of having an officer in each facility monitor implementation of the decree in his facility and to report his findings to the central office. Again there was discussion of complaints about the presence of more correction officers at strip frisks than the consent decree authorized.

At the close of the January, 1991 conference the court had complained that the conferences were a waste of its time since those in attendance representing the defendants claimed to be without authority to make any final determinations. The defendants sent representatives authorized to make binding decisions to the April, 1991 conference. The discussion and apparent agreement at the January, 1991 conference (concerning having someone at each facility to monitor implementation of the consent decree) proved to be another waste of time since defendants at the April meeting indicated an unwillingness even to consider that idea or to deviate from their current practices and interpretations deemed by the court at odds with the decree, except pursuant to formal motion practice. The court agreed that if defendants insisted that the matter could not be resolved except pursuant to formal proceedings that plaintiffs would have to file the necessary motion to set forth the issues they wished resolved.

## II

After some delay plaintiffs have now moved for an order holding defendant Coughlin in contempt, modifying the decree to require its publication in a handbook distributed to inmates and its posting in the library of each facility, appointing a special master to monitor future compliance and to make recommendations as to monetary damages to be paid to inmate victims of violations of the decree and for attorney fees. Defendants, in addition to opposing the motion, have themselves moved to modify the decree to permit the presence of more than one officer during strip searches/strip frisks.

1. These are heavy security units to house those   regarded as most dangerous.

The court convened the parties in a conference on May 20, 1993, to secure their guidance on how they wished to proceed, that is, whether on submission or with a hearing. Both sides negated the idea of a hearing and requested that the controversy be resolved on the submissions of the parties. Before ending the conference, the court attempted again without success to get the parties to negotiate their differences.

The assistant attorney generals representing the state at these court conferences have challenged the credibility of the factual representations made by counsel for plaintiffs and intervenors. The long list of infractions of the consent decree recited by plaintiff at these conferences has been uniformly rejected by state officials who have refused to concede that any violations of substance have occurred. Where there were disputes concerning interpretation of the agreement's terms, state officials were willing enough to accept the court's view when it concurred with their own, but not otherwise.

The basic cause for defendants' posture seems to rest on their belief that the consent decree restricts the discretion of correction officers in the handling of strip searches and strip frisks more than would now be required under the present governing law both in this circuit and elsewhere. Defendants' Memorandum of Law in Opposition To Plaintiffs' Motion at 13–18. That in part explains their refusal to meet the plaintiffs' counsel halfway and their failure to maintain a cooperative relationship with them in an effort to provide mutual assurance of the good faith implementation of the decree.

The plaintiffs with this motion have submitted documentation of defendants' continued and consistent infractions of the consent decree. Defendants do not appear to dispute these charges. Defendants' argument is that DOCS engages in some 11,000 strip frisks per week and, therefore, the hundred or so violations plaintiffs complain about proves that thousands of strip frisks are performed consistent with the terms of the decree and thus defendants are in substantial compliance with the decree. I am not impressed by that argument, except that the contention does indicate why plaintiffs need to obtain court relief to insure good faith adherence to the terms of the decree. Defendants are in violation of their obligations, voluntarily assumed pursuant to the settlement agreement, when any infraction occurs. Failure to acknowledge or accept this fact raises serious doubt as to whether the state fully understands all the implications of its commitment as signatory to the agreement.

## III

Plaintiffs submitted documentation showing that inmates were sometimes required to put their fingers in their mouths, run them along their gums, and pull back their lips to reveal their teeth and gums. This procedure is often required at the end of the strip frisk, after the inmate has been required to handle his testicles, and many find this particularly degrading. The practice is being followed at Downstate, Southport, Auburn, Clinton, Attica, Great Meadow, Woodbourne, Shawangunk, Green Haven and Fishkill. Declaration of Fuller in Support of Motion at pp. 55–62. This is a variation from the procedure authorized in the consent decree, but complaints would probably be reduced to a minimum if the officers had the inmates handle their mouths before fingering their privates.

Under the terms of the settlement agreement, probable cause to believe that an inmate may be in possession of contraband capable of being secreted in his anal or genital area suffices to warrant a strip frisk. But probable cause has to be determined by an officer of the rank of sergeant or higher, except when an inmate is outside the facility and an officer above the rank of sergeant is not present. The officer making the probable cause determination must record that finding in writing. In addition, the written record must include the name and number of the inmate, the time, the place, the scope of the search, whether force was used, the names and ranks of the person(s) conducting and/or present at the search and the result of the search. Such records were to be supplied to plaintiffs' attorney for a period of one year from July 21, 1983.

Defendants make no claim that this record keeping provision is being observed. While there is no longer any requirement that such

records be supplied to plaintiffs' counsel, the stipulation requires that such records be kept. The obvious purpose of this requirement is to insure adherence to the restriction of strip frisks to probable cause situations, except in specific instances defined in the settlement. Ignoring these strictures of the consent decree, as defendants have done wholesale, constitutes egregious and contumacious violations of the agreement.

On being transferred from one correctional facility to another, the inmate "may be strip frisked or strip searched at the discretion of the transferring officer at the facility from which he is being transferred. In the absence of probable cause *as set forth above,* he/she will not be strip frisked or strip searched at the receiving facility." (Emphasis supplied) Plaintiffs have documented numerous violations of this provision. Declaration of Fuller in Support of the Motion at p. 7.

Most violations in this category have come with transfers from one SHU to another SHU unit. After a contact visit all inmates may be strip frisked. On "initial entry into a [SHU] the inmate may be strip frisked. *No other strip frisk may be conducted on a [SHU] inmate except in accordance with the other provisions of this decree.* When an inmate is transferred from a [SHU] in one facility to a [SHU] in a different facility, he/she may *not be strip frisked or strip searched upon entry into the [SHU] in the receiving facility.*" (Emphasis supplied)

Plaintiffs have documented wholesale violations of this stipulation. SHU inmates are routinely strip frisked on initial entry into a SHU, upon transfer to another SHU, on leaving the transferring unit, and again on arrival at the new unit at Ulster, Great Meadow, Shawangunk, Southport, Attica, Auburn, Clinton, Eastern, Downstate and Sullivan. Sometimes these unauthorized searches are undertaken as part of a clothing exchange which in fact amounts to an unauthorized strip search. Declaration of Fuller in Support of Motion at pp. 7–14.

The consent decree further provides: "upon admission to psychiatric housing, a strip frisk may be conducted if determined to be necessary for psychiatric reasons by a qualified medical provider. The strip frisk should be conducted by medical personnel. If a strip frisk is not done, the medical personnel should conduct a disrobed medical examination upon initial intake to (sic) the housing unit. If such examination is not possible, a correction officer may conduct a strip search if, in his discretion, he believes it to be necessary." On leaving the unit there is to be no strip frisk or strip search, "except in accordance with other provisions of this decree."

Plaintiffs have documented disregard of these limitations. Declaration of Fuller in Support of Motion at 21–22. However, documentation is not necessary. Defendants at conferences with the court, *see discussion supra,* indicated that medical personnel are deferring to correction officers in determining whether a strip frisk is warranted and in conducting the search or frisk. There is absolutely no justification given for this departure from the specifications of the decree. This is another egregious infraction, which indicates that defendants routinely are refusing to insure adherence to the terms of the decree.

When an inmate leaves on supervised trips, an officer in his discretion may strip frisk or strip search the inmate when it appears that the inmate has had "[n]otice of the date . . . of the trip . . .[,] . . . [a] history of escape, absconding or attempts thereof, using contraband, or . . . [a] history of possession of contraband used or attempted to be used for the purpose of escape, attempted escape or assault on a correction officer or attempted assault on a correction officer." On return from a supervised outside trip, there is to be no strip frisk or strip search "unless the escorting officer(s) has lost sight of the inmate or his hand movement and, in his discretion, believes the inmate is in the possession of contraband."

Plaintiffs' documentation in this area points to routine strip frisks being administered on leaving the facility and on return at Auburn, Attica, Gouverneur, Green Haven, Shawangunk and Wende. Plaintiffs have also set out in this category those instances in which the inmate knew in advance that

he/she was going on an outside trip—usually this was for a court appearance. Plaintiffs make no complaint concerning strip frisk or strip searches prior to an outside trip when the inmate had advance notice. Declaration of Fuller in Support of Motion at 14–20.

The normal practice in DOCS some ten years ago when the settlement was negotiated was not to give inmates advance notice of outside trips. That would appear to be sound penological policy, and there is nothing on record to indicate that DOCS has changed the practice of not giving advance notice of outside trips. Defendants, however, take the view that inmates are always aware in advance of the time when they are going outside the facility and for that reason strip frisking the departing inmate is routinely authorized. Strip frisks on return to the facility are also routinely justified on the basis that the officer lost sight of the inmate during the trip.

It is evident from the proof offered by plaintiffs that defendants are no longer conducting these strip frisks and searches in accord with the terms of the consent decree. On the contrary, DOCS has returned largely to the procedure in place before the consent decree, i.e., routinely conducting multiple and indiscriminate strip frisks and searches.

Constant and repetitive strip frisking of the inmates may provide the correction officer with a greater sense of security, but in all probability the practice is adhered to because it is the way correction officers have always operated. Nonetheless, DOCS is committed, pursuant to the consent decree, to a more discrete policy.

The agreement is explicit in mandating that strip frisks be conducted in the most dignified and least intrusive manner possible by an officer of the same sex as the inmate. These exercises are to be held in clean and heated areas, where the inmates can keep their clothing off the floor, and in areas where the inmates will have privacy during the frisks or searches. Only the frisking officer is to be present and a supervisor on hand to observe the procedure. The presence of additional personnel is authorized only when a group search of inmates is re-

quired, or where there is reason to believe the inmate will actively resist the search.

These provisions are also not being observed. In video tapes and other documentation, the searches are being held before three or more officers, in areas through which correctional personnel come and go while the search is in progress, some being women while men are in various stages of undress. Thus the privacy mandated in the decree is not being afforded. These infractions are documented as occurring at Auburn, Southport, Attica, Clinton, Downstate, Eastern, Elmira, Great Meadow and Shawangunk. Declaration of Fuller in Support of Motion at 28–40. See Video Tapes.

Moreover, defendants have interpreted the except "when there is reason to believe that the inmate will actively resist the search ..." provision in the decree as permitting the presence of additional officers "when the inmate has a history of violence, threats of violence, aberrational behavior". Defendants' Memorandum in Opposition to Plaintiffs' Motion at 12.

This reading of the proviso is altogether unreasonable. The phrase in the consent decree was meant to embrace cases in which there were concretized indications providing the defendants with good cause to believe that an attempt to strip frisk or strip search a particular inmate would be met with physical resistance. The situations which give rise to such a belief may vary, but these circumstances are necessarily individualized, not subject to determination based solely on a past history of violence which may provide no indication of the inmate's propensity to resist strip frisks or strip searches. Past records must provide more certain clues as to the inmate's propensity to resist such procedures than a record of violence alone. Before reliance on the inmate's record could meet the decree's yardstick authorizing the presence of additional personnel, the record has to involve physical resistance to strip searches, assaults or attempted assaults on correction officers.

Defendants, however, are not operating on an individualized basis. The wholesale reliance on the inmate's record of violence to justify the presence of additional personnel

in essence makes the "reason to believe" provision in the decree superfluous. Indeed, virtually every inmate in many of the state's correctional facilities has a record of violence and some act of violence is usually the cause of their being placed in state custody.

Plaintiffs have also documented instances when correction officers have humiliated and ridiculed the inmate while conducting the strip frisk. Declaration of Fuller at 40–45. This is surely at war with the decree since it is precisely the kind of humiliation the decree was designed to eliminate.

## IV

■ Defendants appear to operate on the assumption that they are not required to adhere strictly to the terms of the consent decree, since it inhibits the correction officers' discretion much more than would be so under present governing law. The present status of the law, however, is irrelevant. When the decree was negotiated, defendants were reasonably confident that they were agreeing to more restrictions than might be imposed if not by this court, certainly on appeal. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), holding that legitimate penological objectives require a withdrawal or limitation of many privileges and rights from prisoners that free men enjoy, had already been decided. The *Bell* decision would seem to support a greater degree of discretion by DOCS than the consent decree countenanced.

Nonetheless, nothing prevents parties from waiving their rights to secure some other objective; *Kozlowski v. Coughlin,* 871 F.2d 241, 244 (2d Cir.1989) ("by consenting to the decree, the Commissioner waived eleventh amendment immunity.") (citation omitted), and settlement of this protracted controversy seemed more attractive than the cost and burden of continuing the litigation, and once entered the consent decree became binding and conclusive. *See Janneh v. GAF Corp.,* 887 F.2d 432, 436 (2d Cir.1989); *Kohl Indus. Park Co. v. County of Rockland,* 710 F.2d 895, 903 (2d Cir.1983).

■ A settlement normally embodies a compromise; the parties economize on costs and eliminate risks and, for those values, give up something which each might have gained in taking the litigation to its conclusion. The parties have opposing purposes and the consent decree embodies these divergent purposes to the extent achievable through the parties' skill and bargaining power. A consent decree is no more than a settlement that contains an injunction. *In re Masters Mates & Pilots Pension Plan,* 957 F.2d 1020, 1025 (2d Cir.1992). The purpose of the decree must be gleaned from its four corners, *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971); *see Huertas v. East River Housing Corp.,* 992 F.2d 1263, 1266; *United States v. Int'l Bhd. of Teamsters,* 978 F.2d 68 (2d Cir.1992); *United States v. O'Rourke,* 943 F.2d 180, 187 (2d Cir.1991), and the decree reflects the understanding of the parties, *Haagen–Dazs Co., Inc. v. Marina Ice Cream Co., Inc.,* 935 F.2d 542, 543 (2d Cir. 1991), and "deference is paid to the plain meaning of the language ... and the normal usage of the terms selected." *Berger v. Heckler,* 771 F.2d 1556, 1558 (2d Cir.1985). The terms of the agreement in this case are clear and unambiguous and must be accorded their normal import.

■ Both parties seek a modification of the agreement. To succeed in that objective there must first be a showing of a significant change of circumstances. *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, ——, 112 S.Ct. 748, 760, 116 L.Ed.2d 867 (1992); *New York State Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 967 (2d Cir.1983), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983). Once this standard has been met, the court must then decide whether the proposed modification is suitably tailored to the new conditions. *Ruofo,* 502 U.S. at ——, 112 S.Ct. at 760.

In this case there has been no substantial change in circumstances to warrant deviation from the terms of the decree. Indeed, defendants, after violating or refusing to comply with the decree are seeking court ratification of their infractions. They have advanced no reason for the desired change other than their belief that in light of the current state of the law and the increase in the number of correctional facilities now housing a larger

inmate population than in 1983, the suggested amendment is in order.

■ A subsequent change in the law, however, is an insufficient basis for modification of an agreement, *Hispanic Soc'y of New York City Police Dep't, Inc. v. New York City Police Dep't*, 806 F.2d 1147, 1152–53 (2d Cir.1986), *aff'd sub nom., Marino v. Ortiz*, 484 U.S. 301, 108 S.Ct. 586, 98 L.Ed.2d 629 (1988); *see also Marino v. Ortiz*, 888 F.2d 12, 13 (2d Cir.1989), *cert. denied*, 495 U.S. 931, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990), and clearly provides no basis for a unilateral change in its terms. Neither does lack of foresight, *Investors Insurance Co. v. Dorinco Reinsurance Co.*, 917 F.2d 100, 105 (2d Cir. 1990), nor the expansion of DOCS, which makes compliance with the decree more onerous, justify noncompliance. *See, e.g., Health–Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir.1990).

■ The modifications plaintiffs seek, on the other hand, are designed to monitor more efficiently oversight of the implementation of the decree. The appointment of a master charged with monitoring enforcement of the decree certainly seems indicated under present circumstances. Defendants have broken away from the original cooperative working relationship with plaintiffs and intervenors. They entirely ignore some of the decree's provisions and interpret others so as to render them null and void or superfluous. Faced with that approach and defendants' intransigence, there is no way to insure good faith adherence to the terms of the decree except through the oversight of a master. I hesitate to order the appointment of a master and burden the state with such costs, but defendants has offered no alternative. Defendants contracted to abide by, implement and enforce the terms of the consent decree. Plaintiffs are entitled to hold them to their bargain.

■ Although a court may not "randomly expand or contract the terms agreed upon in a consent decree", *E.E.O.C. v. Local 580*, 925 F.2d 588, 593 (2d Cir.1991), the reasonable imposition of equitable remedies outside the confines of the decree is permitted to secure compliance by the parties. Accordingly, the appointment of a master to oversee enforcement of the consent decree will issue, unless a viable alternative, agreed to by the parties and acceptable to the court, is proposed forthwith, that is no later than September 10 next. While I agree that enforcement would be enhanced if defendants are required to pay monetary damages for infractions, defendants are given one last opportunity to show that an order to that effect is not necessary. If defendants continue to ignore their obligations under the decree, then certainly such sanctions will have to be imposed.

Defendants are ordered to post the consent decree in the library of each facility or to propose alternative means of broadcasting the decree to insure it comes to the attention of each inmate, any alternative, of course, must be agreed to by plaintiffs. The publication must be in Spanish as well as English. Plaintiffs seek publication of the decree in a handbook for inmates. I am not certain I understand what that means in terms of more effective and certain distribution to the inmate population and costs. The parties are requested to address these issues in memoranda to the court to be submitted no later than September 10 next.

■ A party may be held in civil contempt where the order is clear and unambiguous, proof of noncompliance is clear and convincing and the party charged with contempt has not been reasonably diligent or energetic in attempting to accomplish what was ordered. *Local 580*, 925 F.2d at 594 (citing to *E.E.O.C. v. Local 28*, 753 F.2d 1172, 1178 (2d Cir. 1985), *aff'd*, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986)); *see also United States v. 20th Century Fox Film Corp.*, 882 F.2d 656, 659 (2d Cir.1989) (contempt occurs when a party violates specific and definite terms of a court order.) There can be no question based on this record that defendants are guilty of contempt and, therefore, subject to sanctions.

Sanctions, however, in this case would serve no useful function and should not be needed unless defendants persist in refusing to accept and adhere to their binding obligation to implement in good faith what was agreed to. Now that it has been made clear that any variance between what the current

law permits and what the consent decree proscribes does not release defendants' from their commitment to adhere to the terms of the consent decree, good faith compliance with the agreement may be forthcoming. If future transgressions occur, there will be no recourse for the court but to impose sanctions.

IT IS SO ORDERED.

## APPENDIX

### CONSENT DECREE IN FULL RESOLUTION OF ACTION

1. The Court has jurisdiction of the subject matter of this dispute pursuant to 42 U.S.C. § 1983.

2. This agreement is in full and final resolution of the action commenced by plaintiff Michael X. Hurley on June 27, 1977, certified as a class action and in which a subclass of Muslim inmates was certified, to enjoin strip frisk policies in New York State correctional facilities.

3. In November 1979, this action was certified as a class action. Pursuant thereto and upon consent of the parties, the class shall consist of all inmates in the custody of the New York State Department of Correctional Services. Pursuant to the December 1980 certification by the Court, and upon consent of the parties hereto, the above class shall include the subclass of Muslim inmates in the custody of the New York State Department of Correctional Services.

4. The above-named parties, without conceding any infirmity in their claims, have determined that resolution of this action on the terms and conditions set forth herein is in the best interests of all parties to this action.

5. Nothing in this decree shall be construed as evidence of an admission by defendants of a violation of any law, regulation, rule, or order.

6. This decree, upon approval of the Court, is final and binding as of the date of final approval and entry of this decree.

7. The parties hereto shall confer in good faith to attempt to resolve any dispute arising out of the terms or conditions set forth in this decree prior to bringing a contempt action.

8. The Court has fully examined the terms of this decree and finds that they are fair and reasonable and not the product of collusion between the parties hereto.

Consistent with the foregoing, and with consent of the parties hereto, IT IS ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

The following definitions shall apply throughout this settlement decree:

a. A strip search is a search of an inmate's clothes once they are removed and a visual inspection of the inmate's naked body. The inmate is not required to display body cavities or perform any other physical acts set forth in the paragraph below;

b. A strip frisk is a search of an inmate's clothes and body including body cavities. For a male this involves one or more of the following procedures: opening his mouth and moving his tongue up and down and from side to side, removing any dentures, running his hands through his hair, allowing his ears to be visually examined, lifting his arms to expose his arm pits, spreading his fingers to expose the areas between his fingers, lifting his feet, lifting his testicles to expose the area behind his testicles and bending over and/or spreading the cheeks of his buttocks to expose his anus to the frisking officer. For females the procedure is similar except females must squat to expose the vagina;

c. A contact visit is a visit during which contact is permitted or in fact occurs between an inmate and any visitor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that the defendants, their officers, agents, employees and successors are hereby enjoined and restrained from requiring or permitting the strip frisking and/or strip searching of inmates in the custody of the New York State Department of Correctional Services, except in accordance with the following provisions of this decree.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that all inmates

may be strip frisked when there is probable cause to believe that they may be in possession of contraband capable of being secreted in their anal or genital area.

1. Any determination of probable cause under this decree must be made by an officer of the rank of sergeant or higher, except when the inmate is outside the facility and an officer above the rank of sergeant is not present.

2. When, during a strip search, an officer finds probable cause to believe that an inmate has contraband concealed in his/her anal/genital areas, a search of that specific area may be made only after compliance with the procedures described in paragraph 1 above. It is further,

ORDERED, ADJUDGED AND DE-CREED, that the official making such a determination shall cause the basis of the probable cause to be recorded in a signed writing. The written record shall include, in addition, the name and number of the inmate, the time, the place, the scope of the search, whether force was used, the names and ranks of the person(s) conducting and/or present at the search and the result of the search. These records shall be supplied quarterly to one of the attorneys for the plaintiffs for a period of one year from the date of this judgment. It is further,

ORDERED, ADJUDGED AND DE-CREED, that when, during a strip search, an officer believes that an inmate may have contraband concealed on an area of his/her naked body, other than in his/her anal/genital areas, the officer may effectuate a further search of that area. It is further,

ORDERED, ADJUDGED AND DE-CREED, that when an inmate is transferred from one Department of Correctional Services facility to another, he/she may be strip frisked or strip searched in the discretion of the transferring officer at the facility from which he is being transferred. In the absence of probable cause as set forth above, he/she will not be strip frisked or strip searched at the receiving facility. It is further,

ORDERED, ADJUDGED AND DE-CREED, that all inmates may be strip frisked after a contact visit. It is further,

ORDERED, ADJUDGED AND DE-CREED, that all inmates shall be permitted the option of having non-contact visits with attorneys. In the absence of probable cause as provided elsewhere in this decree, no strip searches or strip frisks may be conducted after such visits. It is further,

ORDERED, ADJUDGED AND DE-CREED, that on initial entry to a special housing unit an inmate may be strip frisked. No other strip frisk shall be conducted on a special housing unit inmate except in accordance with the other provisions of this decree. When an inmate is transferred from a special housing unit in one facility to a special housing unit in a different facility, he/she may not be strip frisked or strip searched upon entry into the special housing unit in the receiving facility. For purposes of this decree "special housing unit" means a housing unit used for disciplinary segregation and/or protective custody. It is further,

ORDERED, ADJUDGED AND DE-CREED, that on admission to psychiatric housing, a strip frisk may be conducted if determined to be necessary for psychiatric reasons by a qualified medical provider. The strip frisk should be conducted by medical personnel. If a strip frisk is not done, the medical personnel should conduct a disrobed medical examination upon initial intake to the housing unit. If such an examination is not possible, a correction officer may conduct a strip search if, in his discretion, he believes it to be necessary.

On exit from a psychiatric housing unit there shall be no strip frisk or strip search, except in accordance with other provisions of this decree. It is further,

ORDERED, ADJUDGED AND DE-CREED, that all inmates may be strip frisked upon return to a correctional facility from a period of unsupervised leave. When an inmate is leaving a correctional facility to go on a period of unsupervised leave, he/she shall not be searched. It is further,

ORDERED, ADJUDGED AND DE-CREED, that when an inmate is leaving on a

supervised outside trip, an officer may, in his discretion, strip frisk or strip search the inmate when it appears that the inmate has:

1. Notice of the date or dates of the trip or trips and/or

2. A history of escape, absconding or attempts thereof, using contraband, or

3. A history of possession of contraband used or attempted to be used for the purpose of escape attempted escape, assault on a correction officer, or attempted assault on a correction officer.

On return from a supervised outside trip, the inmate shall not be strip frisked or strip searched unless the escorting officer(s) has lost sight of the inmate or his hand movement and, in his discretion, believes the inmate is in the possession of contraband. It is further,

ORDERED, ADJUDGED AND DE-CREED, that strip frisks and strip searches shall not be conducted as a part of a general search of any facility or portion of a facility except as follows:

1. During a routine block search an inmate may be strip searched and subjected to an inspection of his/her mouth, ears, hair, hands, armpits and feet.

2. During a search undertaken in response to a major threat to the security of the facility and such search having been duly authorized by the Commissioner or a Deputy Commissioner, a strip frisk of an inmate may, if necessary, be conducted. It is further,

ORDERED, ADJUDGED AND DE-CREED, that any strip frisk or strip search shall be conducted in the most dignified and least intrusive manner possible and by an officer of the same sex as the inmate. It is further,

ORDERED, ADJUDGED AND DE-CREED, that the Department shall maintain a rule or regulation providing that all strip frisks and strip searches shall be conducted in areas which are adequately clean and heated and where inmates can keep their clothes off the floor. It is further,

ORDERED, ADJUDGED AND DE-CREED, that every strip frisk or strip search shall be conducted with only the individual searching officer and, if necessary, a supervisor able to observe the search, except under the following circumstances:

1. When a major disturbance of the facility requires that inmates be held and searched in groups, or

2. When there is reason to believe that the inmate will actively resist the search, thereby necessitating the presence of additional officer(s) It is further,

ORDERED, ADJUDGED AND DE-CREED, that the defendants, their officers, agents, employees and successors are hereby permanently enjoined and restrained from conducting strip frisks or strip searches of Muslim inmates except in those situations and under those conditions that they may be performed on other inmates. It is further,

ORDERED, ADJUDGED AND DE-CREED, that the Department of Correctional Services shall make a copy of this decree available to each security employee employed by the Department, shall explain its meaning in lay language to each of these employees, and shall include a thorough explanation of its provisions in its training of new correction officers; and it is further,

ORDERED, ADJUDGED AND DE-CREED, that a copy of this decree shall be posted in each housing unit and each law library located in a correctional facility operated by the New York State Department of Correctional Services and a copy shall be given to the chairperson of each inmate grievance resolution committee and the chairperson of each inmate liaison committee; and it is further;

ORDERED, ADJUDGED AND DE-CREED, that except as specifically granted by this judgment all claims and applications of the named plaintiffs, members of the plaintiff class and members of the plaintiff-intervenor class, including but not limited to all claims for monetary damages be and they hereby are denied. It is further;

ORDERED, ADJUDGED AND DE-CREED, that this Court shall retain jurisdiction to enforce the terms of this decree and

34

to entertain applications for costs and attorneys' fees.

Dated: New York, New York
July 21, 1983

/s/ Robert L. Carter
United States District Judge

ON CONSENT:

/s/ Tarquin Bromley
Robert Abrams, Esq.
Attorney General of the State of New York
By: Tarquin Bromley, Esq.
Assistant Attorney General
Attorneys for Defendants

/s/ David C. Leven
David C. Leven, Esq.
Prisoners' Legal Services of New York
Attorneys for Plaintiffs

/s/ Claudia Angelos
Claudia Angelos, Esq.
Washington Square Legal Services, Inc.
Attorneys for Plaintiffs–Intervenors