Nidia BARCIA, et al., Plaintiffs,

v.

Louis SITKIN, et al., Defendants.

MUNICIPAL LABOR COMMITTEE, et al., Plaintiffs,

v.

Louis SITKIN, et al., Defendants.

Nos. 79 Civ. 5831 (RLC), 79 Civ. 5899 (RLC).

United States District Court, S.D. New York.

Sept. 8, 1994.

Raff & Becker, New York City, for plaintiffs (Robert L. Becker and David Raff, of counsel).

Attorney Gen. of the State of N.Y., New York City, for defendants (Harvey J. Golubock, Howard L. Zwickel, and Roy A. Esnard, of counsel).

## OPINION

ROBERT L. CARTER, District Judge.

The background of this discrimination action brought against the Unemployment Insurance Appeal Board of the State of New York (the "Board") and the New York State Department of Labor (together, "defendants") is set forth in two opinions reported at 683 F.Supp. 353 (S.D.N.Y.1988) and 89 F.R.D. 382 (S.D.N.Y.1981), and a third, unpublished opinion, No. 79 Civ. 5831 (S.D.N.Y. September 14, 1983), with which familiarity is assumed. In 1983, the parties entered into a Consent Judgment and Decree, dated March 2, 1983 (the "Consent Judgment"), as modified by a Stipulation and Order, dated June 6, 1985 (the "Stipulation") (together, the "Consent Decree"), to settle the claims of plaintiffs that they had been improperly denied unemployment benefits and fair hearings. Currently, plaintiffs have moved to find defendants in contempt of court for vio-

lating the Consent Decree.[1] Alternatively, plaintiffs seek a declaration that defendants are required to comply with the Consent Decree in all respects as to which they are presently not in compliance. In addition, plaintiffs ask for certain specific forms of relief, including a computerization and enhancement of the monitoring system currently in place to ensure defendants' compliance with the Consent Decree, a determination by the court that the time period during which plaintiffs have the right to monitor such compliance has not yet expired, an appointment of a Special Master, pursuant to Rule 53, F.R.Civ.P., various modifications of the Consent Decree and all reasonable attorney's fees, costs and disbursements associated with the filing and prosecution of their original contempt and supplemental motions.

### I.

The Board provides the exclusive means for individual claimants to appeal determinations, rules and orders of the Commissioner of the New York State Department of Labor. New York Labor Law § 626 (McKinney 1988). A brief summary of the Board and its case file review procedures for both current and past claims as prescribed by the Consent Decree is set forth below.

Following an adverse determination by an Unemployment Insurance Division office, a claimant is entitled to a hearing before a Board-supervised Administrative Law Judge (an "ALJ"). After an ALJ's decision is issued, the parties have the right to appeal to the Board for a limited period of time.

When a timely appeal is made, the case is randomly assigned to a staff attorney, who reviews the transcript of the hearing and relevant documentation (a "current case file"). To conduct his or her review, the staff attorney completes a checklist, established pursuant to Consent Judgment ¶ 39, and attached thereto as Appendix E (the "E checklist"), in an effort to ensure that the claimant received a fair and impartial hearing. The staff attorney then sends the completed E checklist along with a Summary of Appeal form—which summarizes the facts of the case and the contentions of the parties and

---

1. Plaintiffs' original motion for contempt and alternative relief was filed on December 22, 1992. Plaintiffs subsequently filed three supplemental motions alleging additional violations of the Consent Decree, dated March 23, 1993, July 15, 1993 and August 24, 1993, respectively.

gives the staff attorney's analysis and recommendation—to the first of two randomly assigned Board members.[2]

The first Board member reviews the file, makes a determination to affirm or reverse the ALJ's decision, and then forwards the file to the second Board member for his or her determination. If the two Board members agree, the decision is forwarded to the parties. If the two disagree, they attempt to resolve their differences. If this is unsuccessful, a third Board member is asked to review the file, and attempts to forge a consensus with the other two Board members. If still unsuccessful, the entire Board, of which there are five members, meets to discuss the case, at which time the majority prevails and two Board members voting with the majority prepare a decision. If the Board reverses an ALJ's decision or where, in the opinion of the full Board, a case raises a substantial issue of law which requires clarification, the Board will write a decision, called a "long form" decision. Also, at this time, a Board member may write a dissenting opinion.

In addition to issuing a decision affirming or reversing an ALJ's decision, a Board hearing may be conducted to develop new testimony, a case may be remanded for an ALJ to develop new testimony, or an ALJ may be asked to hold a new hearing on specific issues in the case. Ultimately, however, whatever remedial action is taken must be reflected on the checklist. If no action is taken, an explanation must be provided to show how a claimant's rights under the Consent Decree were otherwise protected.

The Board also reviews the past claims of those who had been denied benefits prior to 1983 and who joined in bringing this action (the "class members"),[3] as required by the Consent Decree. A second checklist, established pursuant to Consent Judgment ¶ 43, and attached thereto as Appendix F (the "F checklist"), was to be completed for each class member case file reviewed by the Board. The F checklist differs from the E checklist only to the degree that the E checklist reflects Board procedures changed or added by the Consent Decree. (*See* Pl.Mem.Supp.Proposed Settlement at 50.)

## II.

A consent judgment or decree is " 'an agreement of the parties entered upon the record with the sanction and approval of the [c]ourt.' " *Schurr v. Austin Galleries of Illinois, Inc.,* 719 F.2d 571, 574 (2d Cir.1983) (quoting *Oyster Bay v. Forte,* 34 Misc.2d 5, 6, 219 N.Y.S.2d 456, 459 (Sup.Ct.1961)). Such an agreement normally embodies a compromise; the parties economize on costs and eliminate risks and, for those values, give up something which each might have gained in taking the litigation to its conclusion. The parties have opposing purposes and the consent decree embodies these divergent purposes to the extent achievable through the parties' skill and bargaining power. *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971); *Hurley v. Coughlin,* No. 77 Civ. 3847, 1993 WL 738455, at *8, 1993 U.S.Dist. LEXIS 10381, at *21–22 (S.D.N.Y. July 29, 1993).

Therefore, the scope of a consent judgment must "be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Id.* 402 U.S. at 682, 91 S.Ct. at 1757; *see also Huertas v. East River Housing Corp.,* 992 F.2d 1263, 1266 (2d Cir.1993); *United States v. International Bhd. of Teamsters,* 978 F.2d 68, 73 (2d Cir.1992); *United States v. O'Rourke,* 943 F.2d 180, 186 (2d Cir.1991). However, without departing from the "four corners" rule enunciated above, a court, when construing a consent decree for enforcement purposes, may look to certain aids, such as the circumstances surrounding a settlement agreement's formation, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. *United States v.*

---

**2.** In certain instances, not at issue here, the review documents are sent to a Senior Staff Attorney before being sent on to a Board member.

**3.** According to plaintiffs, there are approximately 50,000 class members.

*ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); *see also Huertas,* 992 F.2d at 1267. Further, an examination of " 'the circumstances surrounding the order and the context in which the parties were operating' " does not violate the "four corners" rule either. *Schurr,* 719 F.2d 571 at 574 (quoting *ITT Continental Baking Co.,* 420 U.S. at 243, 95 S.Ct. at 938). Finally, "deference is paid to the plain meaning of the language ... and the normal usage of the terms selected." *Berger v. Heckler,* 771 F.2d 1556, 1558 (2d Cir.1985).

■ Resort may be had to extrinsic evidence only if the document contains language found to be ambiguous. *Schurr,* 719 F.2d at 575. An "ambiguous" word or phrase has been defined as "one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular 'trade or business.' " *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987) (citation omitted). The simple existence of differences in interpretation between the parties, however, does not automatically lead to a finding of ambiguity. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989).

Although a court may not "randomly expand or contract the terms agreed upon in a consent decree," *E.E.O.C. v. Local 580,* 925 F.2d 588, 593 (2d Cir.1991), a court, relying upon the quasi-judicial nature of consent decrees, may resort to equitable considerations. *See, e.g., Chrysler Corp. v. United States,* 316 U.S. 556, 62 S.Ct. 1146, 86 L.Ed. 1668 (1942) (duration of given provision extended even though extension not provided for in decree itself). In such cases, the proper test is whether " 'the [requested interpretation] serve[s] to effectuate or thwart the basic purpose of the original consent decree.' " *United States v. American Cyanamid Co.,* 719 F.2d 558, 564 (2d Cir.1983) (quoting *Chrysler Corp.,* 316 U.S. at 562, 62 S.Ct. at

1149–50), *cert. denied,* 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984).

■ If a court determines that one party has violated a consent decree, it may hold that party in civil contempt where the decree is clear and unambiguous, proof of noncompliance is clear and convincing and the party charged with contempt has not been reasonably diligent or energetic in attempting to accomplish what was ordered. *Local 580,* 925 F.2d at 594 (citing to *E.E.O.C. v. Local 28,* 753 F.2d 1172, 1178 (2d Cir.1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986)); *see also United States v. 20th Century Fox Film Corp.,* 882 F.2d 656, 659 (2d Cir.1989), *cert. denied,* 493 U.S. 1021, 110 S.Ct. 722, 107 L.Ed.2d 741 (1990) (contempt occurs when a party violates specific and definite terms of a court order). Although proof of willful disobedience is not required for a contempt finding, *Local 28,* 753 F.2d at 1178, "an unclear order provides insufficient notice to justify a sanction as harsh as contempt." *Fonar Corp. v. Deccaid Services, Inc.,* 983 F.2d 427, 429 (2d Cir.) (citation omitted), *cert. denied,* 114 S.Ct. 309 (1993).

■ In addition, a consent decree may be modified, but there must first be a showing of a significant change of circumstances. *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, ——, 112 S.Ct. 748, 760, 116 L.Ed.2d 867 (1992); *New York State Ass'n for Retarded Children v. Carey,* 706 F.2d 956, 967 (2d Cir.1983), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983). Once this standard has been met, the court must then decide whether the proposed modification is suitably tailored to the new conditions. *Rufo,* 502 U.S. at ——, 112 S.Ct. at 760.

### III.

### A.

■ The Consent Judgment provided that plaintiffs had the right, for a period of three years from its signing in 1983, to inspect up to 600 current case files per year to monitor the Board's compliance. (Consent J. ¶ 42.)[4]

---

**4.** The Monitoring Period applied only to plaintiffs' review of current case files. For class

member cases, plaintiffs' monitoring rights continued for as long as the Board still had out-

In 1985, this period (the "Monitoring Period") was extended by the Stipulation, for at least three additional years. (Stip. ¶ 1(a).) The Stipulation further provided that "upon completion of the three year review period, the parties shall discuss the need for an extension of the review period and the time period of such extension. Defendants shall not unreasonably refuse plaintiffs' counsels' [sic] request for an extension." (Stip. ¶ 1(c).) Defendants now contend that the Monitoring Period expired in 1988, three years from the date of the Stipulation, and, as a result, they were relieved of all obligations co-extensive with the Monitoring Period.

However, it was not until January 22, 1992, that the Board first informed plaintiffs of its belief that the Monitoring Period had expired, and that defendants had "satisfied the spirit as well as the letter of the consent judgment." (Letter from Timothy Coughlin to David Raff of 1/22/1992, at 1).[5] In this letter and in a second one, dated June 12, 1992, the Board told plaintiffs that they no longer had the right to review current case files or to participate in the design and presentation of annual training sessions for ALJs. (*See* Consent J. ¶ 46 & Stip. ¶ 4.) Plaintiffs, who had been continuously monitoring defendants' compliance with the Consent Decree, rejected the Board's attempt to terminate these rights, and sought mediation. The parties being unable to reach an agreement, plaintiffs filed this motion.

Plaintiffs argue, first, that the Monitoring Period has yet to expire because "during the entire time the Consent Judgment has been in effect, the Appeal Board has not instituted any meaningful internal monitoring system to enable it to know whether it is in compli-

ance and, if it is not, to assist it in achieving compliance" with the Consent Decree. (Pl.Mem.Supp.Mot.Contempt at 17.) Therefore, according to plaintiffs, that condition which was to mark the beginning of the Monitoring Period has not been met. (*See* Stip. ¶ 1(a) (three year period to begin to run "upon the date defendants have in place the filing and case selection system necessary to afford plaintiffs' counsel proper review under paragraphs 41, 42 and 43 of the Consent Judgment".))

But the court cannot agree that the Monitoring Period has not yet begun for failure to implement an internal monitoring system. Since the signing of the Consent Judgment in 1983, defendants have had a system enabling plaintiffs' counsel to review up to 600 current case files per year, and a like number of class member case files. It is the court's understanding that this system was designed precisely to enable plaintiffs to monitor defendants' performance, and, given the number of Consent Decree violations that plaintiffs have alleged in their papers, this system appears to be serving its purpose quite adequately.

Moreover, if plaintiffs' claim is that the Monitoring Period cannot begin until defendants have implemented the computer-based monitoring system proposed by plaintiffs in their papers,[6] then the court rejects this claim as well. By necessity, the Consent Decree represented a compromise, an expression of mutual assent given the relative bargaining strengths of the two sides, and not a wish-list for all that one or the other side would like. *See Armour & Co.*, 402 U.S. at 681, 91 S.Ct. at 1757. Plaintiffs negotiated

standing class member cases to review. (Consent J. ¶ 43.)

5. This letter, however, did not contain defendants' current claim that the Monitoring Period had ended as early as 1988.

6. The system requested by plaintiffs was a computer-based monitoring and reporting system that entailed: "(a) computerizing the E checklists and having the appeal ALJ complete the checklist on his or her terminal so that the information could be easily compiled into a data base; (b) stating the date the checklist was completed, name of the hearing ALJ who decided the case,

the appeal ALJ who reviewed the case, any Senior or 'clearing' ALJ who 'cleared' the case, and the Board members deciding the case; (c) indicating the type of case, e.g., misconduct, voluntary quit, refusal of a job, search for work; (d) noting the substantive action taken, e.g., affirmed, reversed, modified, remanded; (e) indicating, if a remedy was necessary, the specifics of the remedy and, if no remedy was necessary, the specific reasons why no remedy was necessary, *see* Consent Judgment ¶¶ 39 and 40; and (f) obtaining software to prepare various reports from the data base." (Raff Aff.Supp.Pl.Mot.Contempt ¶ 35.)

for and obtained an internal monitoring system that provided for the opportunity to review up to 600 case files per year, and they have failed to persuade the court that the system in place is so deficient or that circumstances have changed such that modification of the Consent Decree is warranted. *See New York State Ass'n for Retarded Children*, 706 F.2d at 969.

Alternatively, plaintiffs argue that defendants' refusal to extend the Monitoring Period was unreasonable. They claim that the numerous Consent Decree violations they allege render unreasonable any attempt to terminate the Monitoring Period at this time and also that defendants could not reasonably refuse to extend the Monitoring Period because a final, remedial order has not been issued resolving another litigation, *Dunn v. New York State Department of Labor*, 474 F.Supp. 269 (S.D.N.Y.1979) (Duffy, J.), in which plaintiffs had earlier intervened.[7] According to plaintiffs, "because of the specific references [in the Stipulation] to the interrelationship between *Dunn* and [this action], a primary factor in evaluating any request for an extension of monitoring and training par-

ticipation" is whether the *Dunn* litigation has been resolved. (PL.Mem.Supp.Mot.Contempt at 21.)

The court, however, finds plaintiffs' claim unsupported by the text of the Stipulation. The Stipulation mentions the *Dunn* litigation three times, in two "Whereas" clauses and in ¶ 7.[8] The WHEREAS clauses merely describe the *Dunn* litigation and plaintiffs' interest in it, but do nothing to link *Dunn* to any provision of the Consent Decree, let alone to the continuation of the Monitoring Period. Paragraph 7 establishes such a linkage, but only with respect to the time periods provided in Consent Judgment ¶¶ 57–60—covering review of the checklists themselves—not to plaintiffs' right to review case files as provided in Consent Judgment ¶ 47.

Plaintiffs seek to admit parol evidence, but the language of Stipulation ¶ 1(c) is not ambiguous. Therefore, the evidence, even though consisting of statements made by Jules Pagano, defendants' chief Consent Decree negotiator and a former Chairman of the Board, cannot be admitted. *See Schurr*, 719 F.2d at 575. The text of the Stipulation

---

7. As counsel articulated in his Affirmation, "In applying [the ¶ 1(c) 'reasonableness'] test, a major consideration had to be whether or not a remedial plan was approved by the court, or the court had otherwise resolved the issues raised in the *Dunn* [litigation], *and* whether Plaintiffs had an opportunity to monitor the effects of the plan, *and* any modifications to the checklists, for a reasonable period after entry of the plan and checklist modifications." (Raff Aff.Supp.Pl.Mot.Contempt ¶ 79 (emphasis in original).)

Plaintiffs have elsewhere explained that the *Dunn* litigation was filed in 1973 and sought relief for "defendants' failure to provide prompt administrative hearings of appeals from denials of unemployment insurance benefits as required by federal law." (Letter from Robert L. Becker to the court of 1/13/1993, at 2.) In 1984, plaintiffs intervened in the action "in light of the inherent tension between the demands of the judgments in the two actions. Specifically, *Dunn* requires that cases be processed and adjudicated with sufficient speed to meet certain timeliness standards. [This action], on the other hand, by requiring that ALJ's insure that parties receive all of the due process rights to which they are entitled under the Consent Judgment, often results in hearings extending for longer periods than originally scheduled, or being adjourned before they can be completed." (*Id.* at 3.)

8. The two WHEREAS clauses state, in relevant part:

"WHEREAS there is pending before the Honorable Kevin T. Duffy a motion by the *Dunn* plaintiffs to cite the New York State Department of Labor for contempt for violating an injunctive provision in the judgment entered in *Dunn v. New York State Department of Labor*, 474 F.Supp. 269 (S.D.N.Y.1979), and a separate motion by the *Municipal Labor Committee* plaintiffs to both enforce the *Dunn* injunction and devise a remedial plan which would protect the rights of the *Municipal Labor Committee* class members in the above captioned cases, ...; and
WHEREAS resolution of the pending motions before Judge Duffy will have an impact upon some of the terms of the Consent Judgment in the above captioned cases; ..."
Paragraph 7 states: "The time periods for review of the checklists set forth in paragraphs 57–60 of the Consent Judgment shall commence upon entry of a court approved remedial plan in *Dunn, supra*, or such other order as resolves the issues in *Dunn*." Paragraph 57 of the Consent Judgment establishes two six-month evaluation periods designed to test the "feasibility" of the E and F checklists, and ¶ 59 provides that after the conclusion of the first six-month period, "the parties shall fully evaluate the effect of the checklists in achieving the goals of the consent judgment."

simply lacks any support for plaintiffs' claim that the continuation of the *Dunn* litigation in and of itself would affect the Monitoring Period. Plaintiffs explicitly linked the *Dunn* litigation to the checklist review period, but failed to do so for the Monitoring Period. If both Pagano and Raff had intended to link the Monitoring Period directly to the *Dunn* litigation, then Stipulation ¶ 1(a) could have been drafted as specifically as was Stipulation ¶ 7.

### B.

The court must also determine whether plaintiffs have shown that defendants have violated the Consent Decree, and, if so, whether the Monitoring Period should be extended. Before turning to plaintiffs' specific allegations, however, it is important to note that, although denominated a "three year review period," the Monitoring Period was not keyed simply to the passage of time. The Stipulation provided that the Monitoring Period did not automatically terminate at the end of three years, but rather, at such time, the parties were required to "discuss the need for an extension of the review period and the time period of such extension." (Stip. ¶ 1(c).) Accordingly, the parties had an obligation to discuss whether it would be unreasonable not to extend the Monitoring Period for some further period.

As shown by their January 22 and June 12, 1992 letters, defendants undertook no discussions, and instead simply invited plaintiffs to challenge the views expressed in them. The court is not aware that defendants even invited mediation, let alone initiated discussions, with respect to any of their other obligations co-extensive with the Monitoring Period. Yet, defendants now claim that, since 1988, they have not been required to comply with any of these obligations. In so acting, defendants necessarily bear the risk that their determination was incorrect.

As discussed below, the court does not believe that defendants could have reasonably refused to extend the Monitoring Period either in 1988 or today. Therefore, at a minimum, defendants cannot avail themselves of the defense that these obligations under the Consent Decree have already expired. Instead, their compliance must be measured continuously, from 1983 through the filing of this motion.

### C.

■ Turning now to their specific allegations, plaintiffs' claim that defendants have violated those provisions covering the training of ALJs and Board legal staff members. (*See* Consent J. ¶¶ 44–48 & Stip. ¶¶ 3–4.) The Consent Judgment obligated defendants to conduct training programs for newly hired ALJs, legal staff members and other relevant personnel of the Board. Defendants were required to create the Training Advisory Committee (which was to include a representative of plaintiffs) (the "Committee"), which would then establish "a curriculum and training program" designed to teach participants about how "the terms of this consent judgment and how the checklists ... are to be utilized." (Consent J. ¶¶ 44–46.) The Committee was to meet a minimum of twice yearly until the end of the Monitoring Period. (Stip. ¶ 3.)

As part of the training program, the Committee was obligated to prepare "at least 3–5 examples ... of the procedural problems for each item on the checklists," and to provide "suggested acceptable resolutions or remedial options" for each example. Further, the training was to include a review of "full case files selected by the Committee" containing "one or more problems which would appear on the checklist" with the Committee offering "instruction on utilization of the checklists." Finally, group discussions between participants and the Committee were to be "a significant part of the training." (Consent J. ¶ 45.) This required training program covered newly hired ALJs and Board personnel, while the Stipulation obligated defendants to "provide ongoing training for all ALJs" with respect to Consent Decree issues, which training was to be conducted at least annually. (Stip. ¶ 4.) Plaintiffs' counsel was given the right to help design and then participate in these training sessions, which right was co-extensive with the Monitoring Period. (*Id.*)

Plaintiffs allege that the Board has failed to convene the Committee biannually since

1985, and, for the 1988, 1989, 1991 and 1992 new hire training programs, has failed to follow the format dictated by the Consent Judgment. (*See* Consent J. ¶ 45.) Further, plaintiffs contend that defendants did not provide the required ongoing training in 1986, 1987 and 1990, and that they denied plaintiffs' counsel "meaningful participation" in the design of the training programs in 1990,[9] 1991 and 1992.[10] (Raff Aff.Supp.Pl.Mot.Contempt ¶ 68.)

Defendants simply blame then-Chairman Pagano for failing to hold annual training sessions in 1986 and 1987, and allege vaguely that "state fiscal restraints" forced the Board to cancel the 1990 training session two weeks before it was to be held. (Coughlin Aff.Opp.Pl.Mot.Contempt ¶ 114.) However, defendants cannot absolve themselves of responsibility merely by blaming a former Board chairman—the Board as an institution has the obligation to train ALJs, not Pagano personally. Further, with respect to 1990, defendants never approached the court seeking interim relief, and cannot now be heard to claim that they had the authority to excuse themselves unilaterally of a very explicit obligation.

Nor, given plaintiffs' description of the circumscribed role permitted counsel in the planning of the sessions, does it appear that defendants enabled counsel to participate meaningfully in the ongoing training sessions. Defendants do not dispute any of counsel's contentions, and seem instead to rely upon the inadequate defense that the training sessions they conducted satisfied their obligations, whether or not counsel participated.

Similarly, defendants' failure to convene the Committee biannually is inexcusable. Even if the court were to accept defendants' contention that the Monitoring Period ended in 1988, defendants have offered no excuse

with respect to the years 1985–88. Further, from 1988 on, defendants at best acted unilaterally in declaring themselves freed from this obligation, and failed even to inform plaintiffs that they believed that their obligation had ended.

As to the training sessions themselves, defendants repeat their assertion that the end of the Monitoring Period relieved them of their obligations. Contrary to defendants' apparent belief, however, their obligations with respect to both the training of new hires as well as ongoing training do not terminate with the end of the Monitoring Period. Although defendants' obligation to allow counsel to participate in the preparation and presentation of ongoing training sessions does so expire, the obligation to conduct training sessions themselves continues for the life of the Consent Decree. Furthermore, even if defendants' obligation to convene meetings of the Committee biannually expires at the end of the Monitoring Period, the Committee's existence must continue throughout the life of the Consent Decree, and the Committee must continue to satisfy its responsibilities with respect to new hire training.

Defendants also claim that the new hire training sessions that they have held satisfy the Consent Judgment's prescription in any event. For example, Coughlin makes no representation that Consent Judgment ¶ 45 has been followed in any of the training sessions since 1983, but indicates that, of the eight case files used in the first training session in 1983, "some" of these files are still in use today. He fails, however, to offer a justification for why all eight are not currently in use or why, if there were problems with some of the original case files, they were not replaced with other files. The Consent Judgment, though, details the content of an adequate training session, and plaintiffs may demand literal compliance with this provision. De-

9. The 1990 training session was planned, but not held. (*See* Raff Aff.Supp.Pl.Mot.Contempt ¶¶ 66 & 68.)

10. In 1990, according to plaintiffs' counsel, "except for input on the names of persons to discuss decision writing, the program was submitted to Plaintiffs' counsel as a *fait accompli.*" In 1991, although he was permitted to submit some writ-

ten suggestions, counsel claims that he "was not given the opportunity to discuss the substance of the training, methodology, or to meet with the trainers," and that none of the concerns set forth in writing were addressed. In 1992, the Board did not seek any input from counsel, and did not advise him of the date for such training until one week before the scheduled training date. (Raff Aff.Supp.Pl.Mot.Contempt ¶ 68.)

fendants have made no claim that the provisions are somehow unduly burdensome or raised any other issue suggesting that the provision should be modified. *See, e.g., New York State Ass'n for Retarded Children,* 706 F.2d at 969. Defendants, therefore, should maintain whatever it is they do currently, and augment the sessions as required by Consent Judgment ¶ 45.

Defendants raise the same defense with respect to the ongoing training sessions, but here the Stipulation neither references the specific provisions of Consent Judgment ¶ 45 nor lists specific requirements of its own. (*See* Stip. ¶ 4.) Nevertheless, defendants have not held training sessions annually as required and, given plaintiffs' undisputed allegations, have curtailed plaintiffs' right to participate in them. (*Id.*) For these reasons, the court rejects defendants' claim that they have satisfied their obligations under the Stipulation, and orders defendants to hold training sessions annually, as required by the Stipulation.[11]

Further, to remedy defendants' failure to allow plaintiffs' counsel meaningful participation in ongoing training, the parties shall formulate guidelines to ensure the protection of plaintiffs' right of participation for the duration of the Monitoring Period. However, although defendants' actions to this point have improperly limited plaintiffs' counsel's involvement, plaintiffs should understand that the right to "participate" does not entitle them to demand that all of their ideas or suggestions be incorporated into the training sessions.

■ Second, plaintiffs allege that defendants have denied benefits to claimants because the Unemployment Insurance Division has failed to follow its own procedures or guidelines. (Consent J. ¶ 9.) Plaintiffs have documented three specific instances in which this occurred, and defendants have not defended or denied these occurrences. Therefore, the court finds that defendants have

violated this paragraph of the Consent Judgment.

Third, plaintiffs contend that of 2,888 "long form" decisions involving class member claims, 1,307 claimants have not received their benefits, in an amount totalling approximately $1 million. Defendants have neither challenged plaintiffs' numbers nor defended their poor performance in paying owed benefits, although plaintiffs do admit that defendants recently "agreed to make some effort to locate and notify" class members of their entitlement to benefits. (Raff Aff.Supp.Pl.Mot.Contempt ¶ 103.) Nevertheless, such laxity on the part of defendants is unacceptable.

Plaintiffs' counsel, in his affidavit, indicated that a "monthly reporting system" was agreed to by the parties, but that its implementation has been unsuccessful because defendants have failed to provide counsel with complete information regarding class member decisions. This problem is to be rectified, and defendants are to establish and implement, within the next 60 days and in compliance with the Notification and Consultation provisions of the Consent Judgment, a procedure for assuring the prompt payment of benefits to all class members so entitled.

■ Fourth, plaintiffs allege that defendants continue to adjourn hearings solely because they extend beyond a single hearing period and then refuse to reschedule adjourned hearings on an expedited basis, (Consent J. ¶ 19), but have failed to offer any evidence in support of this claim. In addition, Timothy Coughlin, the Board's current Executive Secretary, denied that such violations occur, and claimed that a Board procedure is in place both prohibiting adjournments for such a reason, and requiring ALJs to reschedule adjourned hearings within two weeks—a time frame necessitated by the fact that hearings are scheduled two weeks in advance. Although defendants acknowledge that, with respect to "pool" locations, it is

---

11. According to plaintiffs, defendants have also refused to allow counsel to review the Consent Judgment with the 8 ALJs hired in the fall of 1991 or the 18 temporary ALJs hired in 1992 (who, according to plaintiffs, were hired specifically to review class member cases). The court

does not view this as a separate violation of the Consent Judgment. However, to the extent that defendants have prevented these ALJs from receiving the prescribed training, defendants have violated the Consent Decree. (*See* Consent J. ¶¶ 44–45 & Stip. ¶ 4.)

often not possible to reschedule hearings promptly when no ALJ will be at such a location within two weeks, Coughlin's affidavit indicates that, in such cases, hearings are re-scheduled as soon as possible thereafter. (Coughlin Aff.Opp.Pl.Mot.Contempt ¶¶ 85–86.)

On this basis, the court cannot find a violation of the Consent Decree. Nevertheless, the court appreciates that, as argued by plaintiffs, the purpose of Consent Judgment ¶ 19 may be thwarted not simply by actual adjournments, but also through other practices, such as pressuring claimants to hurry their case when a hearing threatens to run beyond one period. Defendants, therefore, are not only prohibited from adjourning hearings solely because they extend beyond one hearing session, they also must not in any way hurry or coerce claimants into finishing their case within one period as a result of this obligation. Furthermore, to the degree that a lack of hearing slots or ALJs prevents defendants from rescheduling a hearing within two weeks, defendants are under a continuing, good faith obligation to reschedule the hearing as soon as possible thereafter.

Relatedly, plaintiffs challenge defendants' alleged failure to "make a good faith effort to establish a promptness goal for an expedited hearing where an adjournment is granted." (Consent J. ¶¶ 3 & 5.) But, as outlined above, the Board has in place a procedure to ensure the expeditious rescheduling of adjourned hearings.

■ Sixth, plaintiffs allege that the Board permits ALJs to deny adjournment requests where employers fail to appear for a scheduled hearing date, or for other "good cause reasons," and instead, although often granting a default judgment in the claimant's favor, "close out hearings with leave to reopen." (Raff Aff.Supp.Pl.Mot.Contempt ¶ 54.) According to plaintiffs, this violates the Consent Decree, (Consent J. ¶ 20), and places an "unfair burden" upon claimants because, the hearing not having been ad-journed, there is no requirement that the hearing be re-scheduled expeditiously. Further, claimants who receive benefits as a result of a default judgment will, if the employer obtains a reopening and then prevails on the merits, be required to return all benefits erroneously provided. This is money, however, that a claimant usually no longer has in his or her possession. (*Id.* ¶¶ 54–55.)

Defendants do not respond directly to this contention, but seem to admit that they have "developed a policy" of "closing such cases rather than adjourning them ..." (Coughlin Aff.Opp.Pl.Mot.Contempt ¶ 88.) They do not seek to justify this policy, nor do they indicate whether this policy was adopted in compliance with the Notification and Consultation provisions of the Consent Judgment. (Consent J. ¶ 53.)

However, the court does not agree that ¶ 20 *requires* an ALJ to grant an adjournment. (*See* Consent J. ¶ 20.)[12] Although the Board's policy or practice may indeed be burdensome for claimants, the provision entitles claimants only to "request" an adjournment for good cause, and does not obligate the ALJ to grant such a request. To find otherwise would be to enlarge the scope of bargained for concessions that plaintiffs received from defendants, and this the court has no justification for doing, absent proof that ALJs have been systematically abusing their discretion to the detriment of claimants.

Nevertheless, the court believes that the Notification and Consultation provisions were not followed in this instance, and that they must now be. (Consent J. ¶ 53.) Further, as described by defendants, the current policy, by awarding benefits that may be revoked at some future, uncertain date, creates an unnecessary risk to claimants, many of whom depend upon their unemployment benefits to help provide basic necessities. Therefore, any procedure that emerges from the discussions of the parties must, at a minimum, limit the period during which awarded benefits run the risk of revocation.

12. Consent Judgment ¶ 20, by incorporating the consent judgment and stipulation of a related case, *Pugh v. Ross*, 76 Civ. 3607 (MEF), and attaching it thereto at Appendix C, gives a claim-ant the right to, among other things, "request an adjournment to a later date for a good reason." (Consent J.App. C at 4.)

Plaintiffs also claim that ALJs routinely allow parties to obtain leave to reopen hearings without a "good cause reason" for such reopening. They contend that this violates the permanent injunction in the *Dunn* litigation, but fail to specify a Consent Decree provision violated by this practice. Further, as in the case of ALJs' alleged refusal to grant adjournments, plaintiffs offer the court no specific instances of such behavior. Therefore, the court can find no violation.[13]

Seventh, plaintiffs claim that defendants have failed to provide claimants and their representatives the same access to facilities and services as has been provided to employer representatives. (Consent J. ¶ 38.) Plaintiffs base their claim on the affidavit of Malcolm Spector, a law school student representing claimants through an organization at the New York University School of Law. According to Spector, while at the Department of Labor one day he struck up a conversation with a woman, Ivonne Rosario, who identified herself as "an employer representative for the City of New York, Department of Personnel." (Spector Aff. ¶ 7.) Spector claims that Rosario told him that "all employer representatives photocopied their transcripts on the second floor," while Spector found that he was denied access to the same photocopying machine. (*Id.* ¶¶ 7, 11.) Defendants deny that they give special access to employer representatives, and claim that they have in place a policy to ensure enforcement of ¶ 38.

Although Spector's affidavit establishes that at least with respect to Rosario, Consent Judgment ¶ 38 was violated, the court cannot credit too broadly Rosario's further, and otherwise unsupported, statements about other employer representatives' access to facilities. Nevertheless, it concerns the court that even in a single instance preferential treatment was given to an employer representative. Given Coughlin's assertion that "under no circumstance is any member of the public permitted to utilize *any* of this equipment,"

other than for Board, staff or Department purposes, (Coughlin Aff.Opp.Pl.Mot.Contempt ¶ 89), the court will look severely upon any documented instance of inequitable access to services or facilities. Defendants' obligation in this respect is unequivocal, and even a single instance of preferential treatment constitutes a Consent Judgment violation.

Eighth, according to plaintiffs, defendants 1) failed to notify plaintiffs of a new Board procedure, adopted in 1987 or 1988, that barred claimants from filing reply papers in the course of an appeal, (Consent J. ¶ 53), 2) have refused to provide plaintiffs with "long form" decisions since 1991 and to provide plaintiffs with notice of Board appeals to the Appellate Division,[14] and 3) have failed to timely respond to plaintiffs' requests for reopenings. Defendants claim that they are no longer obligated to provide counsel with notice of new Board procedures because the Monitoring Period has expired, and that they have never been obligated to provide plaintiffs either with "long form" decisions or notices of appeal. They do not respond to plaintiffs' claim with respect to reopening requests.

As previously noted, defendants were not entitled to unilaterally absolve themselves of their obligations under the Consent Decree. As a result, and because the Monitoring Period has not yet ended, defendants have violated the Consent Decree by failing to notify plaintiffs of their new procedure (which plaintiffs learned of only when preparing their papers for this motion). Therefore, although no remedial action is ordered with respect to claimants affected by this procedure between the time of its implementation and today, defendants are ordered to suspend enforcement of the procedure until the Notification and Consultation provisions have been complied with. (Consent J. ¶ 53.) In addition, because the court cannot know whether other procedures have changed or been added which have yet to come to plain-

---

13. Plaintiffs also ask the court to order the Board "to establish standards, guidelines, or training materials for the application of 'good cause'" as that term is used in various provisions of the Consent Decree. (Raff Aff.Supp.Pl.Mot.Con-

tempt ¶ 57.) However, the Decree contains no provision entitling plaintiffs to such an order.

14. Appeals of Board decisions are to be taken to the Appellate Division, Third Department.

tiffs' counsel's attention, defendants are ordered to notify plaintiffs, in accordance with the Notification and Consultation provisions, of any changes in procedures occurring since 1988.

Defendants, however, are correct that the Consent Decree does not require them to provide plaintiffs with either "long form" decisions or notices of appeal. As defendants further point out, "long form" decisions are available to the public at the Board's facilities in Brooklyn. However, notices of appeal are not so readily available, and it would be unreasonable to expect individual plaintiffs—at least some, if not most, of whom would be unaware of the Consent Decree—to notify plaintiffs' counsel of a pending appeal. Therefore, owing to the importance of plaintiffs' counsel's awareness of these appeals and the limited burden that plaintiffs' request would impose upon defendants, the court orders defendants, for the duration of the Monitoring Period, to notify plaintiffs' counsel promptly of any appeals to the Appellate Division in which the Consent Decree is implicated. Finally, there is no reason why defendants should not respond to plaintiffs' requests for reopening cases within 60 days of receipt.

Next, plaintiffs claim that the Board has violated the Consent Decree by abandoning the "Appeal Board Manual," (Consent J. ¶ 49), and by continuing to discourage the filing of dissenting opinions. (Consent J. ¶ 8.) Defendants deny both claims.

■ Although Timothy Coughlin admits that the Manual is no longer in print, he indicates, in his affidavit, that photocopies of the Manual are given to all ALJ trainees and that the Manual has been incorporated into the current Board Rules since 1984. (Coughlin Aff.Opp.Pl.Mot.Contempt ¶ 109.) Plaintiffs do not challenge Coughlin's claim or provide evidence that the Manual contained procedures or rules different from or in addition to those defendants currently follow. Further, under the Consent Judgment, the Board is not required to continue to use the Manual, but rather only to amend the Manual, as necessary, to conform it to the 1983 Consent Judgment. (Consent J. ¶ 49.)

Defendants also maintain that they do not "judge shop," and that any Board member may file a dissent. But even though, unlike the first two Board members assigned to review a case file, the third or "tie-breaking" Board member is not randomly assigned, (see Coughlin Aff.Opp.Pl.Mot.Contempt ¶¶ 79–81), and the opportunity to write a dissent arises only after the full Board has voted on a case, (id. ¶ 81), this practice does not violate ¶ 8. Although it is apparently true that no dissents have been written since 1983, the court cannot require dissents to be written.

The Board's practice does not deny a Board member the ability to issue a dissenting opinion, as the Board's practice prior to the implementation of ¶ 8 allegedly did, but only delays the time at which a dissent may be written. Further, to cause defendants to allow a dissenting Board member to issue an opinion at an earlier time in the Board's review process (and effectively end the process at this point) would require defendants to revise substantially the way in which cases are currently reviewed, and likely impinge upon the Board's "prerogative," as explicitly guaranteed by ¶ 8, to have the full Board consider any case. This the court has no justification for doing.

### D.

Independent of any particular violation of a Consent Decree provision, plaintiffs offer certain statistically-based arguments to show that any attempt to terminate the Monitoring Period would be unreasonable. First, plaintiffs maintain that the success rate for claimants appealing adverse hearing decisions to the Board has dropped from an average of 21% in 1986 and 1987 to 9.29% for the first nine months of 1992, and that this decline represents proof of the Board's increasingly hostile attitude towards claimants. (Raff Aff.Supp.Pl.Mot.Contempt ¶ 101.) [15] In addition, plaintiffs claim that anti-claimant bias is also shown in that the success rate for claim-

---

**15.** According to plaintiffs' own figures, during this same period of time, the success rate for employers appealing hearing decisions has gone from 20.15% to 11.26%. (Raff.Aff.Supp.Pl.Mot.Contempt ¶ 101.)

ants in the first nine months of 1992 (9.29%) was lower than that for employers during the same period (11.26%).

However, plaintiffs fail to provide any expert or other support to show the statistical significance of the relative decline of the claimant success rate when compared with that of employers. Similarly, the court cannot independently evaluate the importance of the roughly 2% difference in the current rate. Further, the court has been offered no guidance as to how to view these figures vis-a-vis the variables that may affect success rates, such as, for example, the strength of a claimant's claim or an employer's defense in any given case.

Second, plaintiffs claim that a review of 6,438 E checklists "over a recent twelve month period," shows that 1,837, or 28.53%, of the checklists contained one or more violations, thereby establishing defendants' continued non-compliance with the terms of the Consent Decree. The "twelve month period" referred to by plaintiffs, however, does not cover a continuous twelve months, but rather covers January, April, September and November of 1991 and January through July of 1992. Plaintiffs provide no justification for ignoring various months in 1991 or August and September of 1992 (even though the argument discussed above included these months), thereby greatly diminishing the court's reliance upon any conclusion drawn from these numbers.

Finally, plaintiffs claim that between 1983 and mid-1989, requests for remedial relief in cases in which plaintiffs believed that checklist violations had occurred but were not noted were granted 136 times (93%) and denied 10 times (7%). Since January, 1991,[16] the Board has granted plaintiffs' requests 29 time (32%) and denied them 62 times (68%).

Again, plaintiffs proceed from the apparent premise that simple differences or changes in the numbers speak for themselves, which they decidedly do not. In their analysis, plaintiffs neglect a discussion of how variables, such as the strength of the grounds upon which a reopening request is based, affect the rate at which requests are granted. Further, plaintiffs leave the court with no sense of the statistical significance of the numbers used to reach the conclusions drawn. Without more, the court is unwilling to accept that the simple denial of a requested reopening is inherently suspect.

### E.

In their first supplemental motion, plaintiffs claim that defendants have provided written Spanish-language translations only of pre-printed, and not of handwritten, sections of Notices of Determination[17] (as well as other notices or instructions), and have provided oral translations of handwritten sections only when claimants have traveled to Unemployment Insurance Division ("UID") offices. (Consent J. ¶ 28.) Although plaintiffs admit that the Consent Judgment requires only oral translations in UID offices for claimants whose local office lacks adequate Spanish-speaking staff, they claim that those local offices with adequate staff must provide written translations of all notices and instructions.[18] Defendants assert that there is no explicit requirement that written translations be provided, and maintain that they need only provide oral translations to claimants.

However, defendants' interpretation renders meaningless the distinction drawn in ¶ 28 between claimants whose local offices have adequate Spanish-speaking staff and

---

**16.** According to plaintiffs, from mid–1989 until January, 1991, defendants neither granted nor denied any of plaintiffs' requests. Plaintiffs did not indicate how many such requests there were.

**17.** Notices of Determination inform a claimant of whether benefits have been awarded or denied, and provide the reasons supporting the determination.

**18.** Consent Judgment ¶ 28 states, in relevant part, "Where notices or instructions contain handwritten entries, they shall be translated into Spanish for Spanish surnamed claimants in those local offices that have adequate Spanish-speaking staff. For all other local offices, all Spanish language notices or instructions which contain handwritten entries in English will contain a legend that the claimants can obtain translation assistance at the local office in accordance with the procedure in paragraph 30 [which requires claimants to appear at the local office to request a translation]".

those whose local offices do not, and an interpretation of a document is to be avoided that would render a portion of it "superfluous or meaningless." *See Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir. 1988); *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985). Further, where, as here, the handwritten portion of the Notice conveys critical information, such as the reasoning behind a claimant's denial of benefits, it would frustrate the purpose of the Consent Decree to require Spanish-speaking claimants to take unnecessary steps to receive such information. Although apparently the parties agreed not to so obligate defendants in locations where Spanish-speaking staff were not present, this was not the case in locations where Spanish-speaking staff were present. Therefore, written translations of all handwritten sections of notices or instructions must accompany the translations of all pre-printed sections sent to those claimants whose local offices have adequate Spanish-speaking staff.

In their second supplemental motion, plaintiffs contend that defendants have been misinterpreting Item 27 of the E checklist (and its companion in the F checklist, Item 23)—which reads, "The transcripts are not adequate"—and so have been improperly interpreting, and hence using, the checklists. To plaintiffs, this checklist language "was always meant to be broadly construed, and specifically covers transcript inadequacies resulting from an ALJ's failure to ask sufficient questions to elicit that testimonial evidence necessary to render an informed decision, as well as serving as a 'catchall' for other inadequacies not identified through use of the other more specific checklist items." (Raff Aff.Supp.Pl.Second Suppl.Mot. ¶ 4.) In contrast, defendants claim that the Items require only that the transcript not contain a defect in the machine recording of the hearing or its transcription that would otherwise prevent a review of the hearing by the Board. (Coughlin Aff.Opp.Pl.Suppl.Mots. ¶ 7.)

Plaintiffs believe that their broad interpretation of Item 27 is consistent with a "theme" of the Consent Decree—that ALJs and Board members must take "specific affirmative steps to assure that claimants receive the fair hearings that they are entitled to." (Pl.Mem.Supp.Second Suppl.Mot. at 14.) Plaintiffs also maintain that as a result of the difficulties entailed in trying to develop a specific checklist item for every type of conduct which might deprive claimants of their fair hearing rights, the parties "agreed that [E checklist, Item 27 and F checklist, Item 23] would be written broadly in order to capture any type of due process inadequacy reflected in the transcript—which had not been identified in the other more specific checklist items." (Raff Aff.Supp.Pl.Second Suppl.Mot. ¶¶ 16–17.) Finally, plaintiffs claim that if the disputed language were designed to apply only to mechanical or transcription problems, "it would have contained that limitation," (*id.* ¶ 22), and that if plaintiffs' interpretation is rejected, "there would be no place on the Checklist to note that the hearing judge failed to adequately question the parties." (*Id.* ¶ 26.)

There are, however, several difficulties with plaintiffs' argument. First, even if defendants' narrow interpretation is accepted, an ALJs failure to elicit sufficient testimony (which appears to be plaintiffs' particular concern) should nevertheless be noted on the Summary of Appeal, and so still form the basis for a remand. Because, however, the Summary of Appeal is not sent to plaintiffs, their concern appears really to be for their ability to monitor ALJ performance. Second, although plaintiffs fairly claim that the checklists would become unwieldy if they were too specific, Item 27 is the only checklist item that plaintiffs point to possessing such a "catch-all" purpose, and the checklists contain other items as specific as one that covered an ALJ's development of the testimonial evidence would need to be. Third, within the checklist itself, Item 27 is both followed and preceded by checklist items that address specific, mechanical issues, such as whether all evidence had been properly marked or whether specific notices sent to a claimant had been placed in the case file.

The court, therefore, cannot agree with plaintiffs' interpretation of Item 27 because neither the text nor their explanation sup-

ports the interpretation that Item 27 was intended as a "catch-all" phrase.

However, confusion has accompanied the implementation of Item 27. Based upon the affidavit of Jules Pagano, it appears that, at least during Pagano's tenure as Chairman, Item 27 has been used to identify instances in which ALJs failed to develop the testimonial evidence. In addition, the memorandum sent by Coughlin to all Appeal ALJs, dated April 8, 1992 ("the April 8 Memo"), in which he "again remind[ed]" ALJs *not* to interpret Item 27 to cover an ALJs failure to elicit sufficient testimony, indicated both a likelihood that the interpretation of Item 27 was changed at some point, and that uncertainty about Item 27's meaning prevailed among Appeal Judges. Questions also exist about when this interpretation might have changed. Despite Pagano's statement, defendants claim that since the first training session Item 27 has been interpreted narrowly. Still, their offered proof—examples of checklist problems used in training sessions showing that "inaudible" transcripts were reflected under Item 27—shows only that Item 27 covered mechanical problems, and not that it was limited to such problems.

Owing to the difficulties in sorting out this issue, therefore, the court believes it best for discussions between the parties to take place in accordance with the mediation provisions and checklist review provisions of the Consent Judgment. (Consent J. ¶¶ 54–55 & 57–61.) Although the court cannot find textual support for the broad interpretation of Item 27 (and Item 23) offered by plaintiffs, it also cannot ignore that these Items have been used in the past to identify an ALJ's failure to develop testimonial evidence adequately. Because this is an important function for ALJs to fulfill and because neither party is a stranger to so interpreting the Items, the parties should undertake discussions to agree on a way to modify the checklist to cover an ALJ's failure to elicit sufficient testimony.

Finally, in their third supplemental motion, plaintiffs claim that defendants have improperly placed the burden of providing translators upon claimants[19] and have not provided properly trained translators, as required.[20] (Consent J. ¶ 26.) Plaintiffs also claim that defendants must provide verbatim translations of any proceedings involving a claimant. Defendants claim that they need not provide verbatim translations, and that the procedures they employ for providing translators satisfies the Consent Decree.

The Consent Judgment is rather specific in its prescriptions regarding the provision of translators. Defendants are required to provide translators where (a) Spanish-speaking claimants so request (and translator staff is available at the hearing location), (Consent J. ¶ 23), and (b) the ALJ, Board or local office determines that a translator is necessary. (*Id.* ¶¶ 23–24.) All Spanish-surnamed or Spanish-speaking claimants are to be asked whether a translator is desired for an ALJ hearing. (*Id.* ¶ 24.) If a translator is requested or if one is required, but is not provided, a hearing shall be adjourned until such time as a translator is obtained. (*Id.* ¶ 25.) Finally, where a translator is used, the translator is required "to translate the entire proceeding and all relevant parts of documents introduced in evidence." (*Id.* ¶ 26.)

Defendants deny that verbatim translation is required, but do not deny plaintiffs' other allegations in so far as they claim that their procedures satisfy the spirit, if not the letter, of the Consent Decree. Timothy Coughlin, in his affidavit, articulated the procedure followed by the Board to provide translators: first, the Board looks to individuals employed by the Civil Service with titles evidencing that they are bilingual, second, it uses bilingual individuals on a contract basis or, in parts of the state other than New York City, employs bilingual staff members, and finally, in areas with less demand, it uses volunteers from schools and public service organiza-

---

**19.** Plaintiffs allege Notices of Hearing have been sent to claimants which state that "[a]ny person who requires help speaking or understanding English should bring an interpreter to the hearing."

**20.** For example, plaintiffs claim that, where claimants fail to bring someone with them, ALJs have gone into the hearing reception area and used anyone willing to volunteer.

tions. (Coughlin Aff.Opp.Pl.Suppl.Mots. ¶¶ 19–21.) Coughlin also indicated that in extreme cases telephone hook-ups to a central location have been used. (*Id.* ¶ 21.) Further, although Coughlin states that the Board "has never condoned" the use of volunteers taken from the waiting area, he does not deny that this occurs nevertheless. (*Id.*)

Contrary to defendants' claims, Consent Judgment ¶ 26 requires that the "entire proceeding" be translated, which to the court plainly means every word of all relevant conversations among the ALJ, the parties and counsel. Further, to be meaningful, this translation must be simultaneous.

Second, of equal importance to the nature of the translation is the competence of the translator. Although the Consent Judgment requires defendants to provide a translator where needed or requested,[21] it offers no guidance as to a translator's qualifications. The court has reviewed both defendants' current policy and the affidavit of Ms. Dena Kohl–Millman, a United States Certified Court Interpreter, and believes the issue can be best resolved by discussions between the parties in accordance with the mediation provisions of the Consent Judgment. Defendants, however, should not make any proposal which relies in any way upon the use of volunteers or telephone hook-ups or in any material way provides translation of a lesser quality than that provided in the Southern District of New York.

### IV.

Several other issues were raised in the parties' papers that need to be resolved. First, the parties disagree as to whether the Consent Decree requires defendants to review each class member case both on the merits and for checklist violations or whether the merits need be reached only if a sufficiently serious checklist violation is found. If the latter, the court must determine whether a sufficiently serious violation must be a "substantial" or "outcome determinative" one or whether the violation need only be one

that "may have" or "might have" affected the outcome.

Consent Judgment ¶ 68, entitled "Guidelines for Remedial Action by the Appeal Board," is the only paragraph that specifically addresses defendants' review of class member cases. The paragraph states, in relevant part, that the Board "shall review those cases covered by this Consent where the claimant has responded to the Reopening Notice and shall apply to those cases, the agreed to checklists." Defendants contend that ¶ 68 limits their responsibility to applying the checklists to the class member case files, and, because the checklists were designed to ensure procedural fairness only, (Coughlin Aff.Opp.Pl.Mot.Contempt ¶¶ 9, 97, 98), defendants need review the merits of a decision only where there is an outcome determinative violation.

Plaintiffs maintain that this paragraph establishes two independent requirements—first, a substantive review of the case, and second a procedural review based upon the checklists. They argue that the Consent Judgment, which establishes that the relief that class members are entitled to "shall be the reopening" of all class member cases, (*id.* ¶ 63), further supports their claim because the term " 'reopen' is a term of art having a very specific meaning under the unemployment insurance law [of New York]." (Pl.Reply Mem. at 21 n. 10.)

However, regardless of plaintiffs' claims with respect to state law, Consent Judgment ¶ 63 does not define "reopening," nor do plaintiffs articulate its meaning or provide authority to support their claim that "reopen" is a term of art. Plaintiffs do offer parol evidence based upon the affidavit of Jules Pagano that defendants did not intend to limit their review of class member cases to checklist violations and intended to review the merits of all class member cases, but the language of the Consent Judgment lacks the necessary ambiguity for such evidence to be admissible. Plaintiffs have also sought to identify specific instances in which merit re-

---

**21.** In this respect, defendants' form of Notice of Hearing as cited by plaintiffs violates the Consent Judgment. However, accepting that the Notice was used as a result of administrative oversight, (Coughlin Aff.Opp.Pl.Suppl.Mots. ¶ 25), the court notes only that any use of Notices not clearly articulating defendants' obligations with respect to the provisions of translators is prohibited.

views were conducted by the Board in cases where, plaintiffs maintain, there were no checklist violations. At best, such an attempt on plaintiffs' part is speculative and, in any event, the relatively few instances identified by plaintiffs over the past 10 or so years is insufficient to establish an earlier agreement to conduct substantive reviews.

The court has previously stated that the Consent Judgment sought to "provid[e] greater procedural safeguards for class claimants in general" and "attempted to anticipate every conceivable issue of procedural deficiency or inadequacy which might result in a claimant not being given adequate notice or full information, deprive him of a fair hearing, or place him in any way at a disadvantage in pursuing his claim for benefits over the opposition of his employer." *Barcia v. Sitkin,* Nos. 79 Civ. 5831 & 5879, slip op. at 5 (S.D.N.Y. Sept. 14, 1983). Ultimately, to claim now, that in addition to the myriad of procedural safeguards, the Consent Judgment also intended that every class member case would be reviewed on its merits regardless of whether there was a procedural violation seems inconsistent with the document's purpose.[22]

This, however, does not resolve the question of the appropriate standard to be used to determine when a checklist violation sufficiently taints a decision so as to warrant a merits review. On this issue, the Consent Decree is silent, but, to aid in interpretation, and without departing from the "four corners" rule, the court may look to certain "aids," such as the circumstances surrounding a settlement agreement's formation, when construing the document for enforcement purposes. *See Huertas,* 992 F.2d at 1267.

To this end, Jules Pagano's affidavit indicated that during negotiations, significant questions about the fairness of hearings were raised. (Pagano Aff. ¶ 13.) As a result the Board's negotiator agreed that "the benefit of any doubt as to whether the violation might have affected the outcome was to be given to claimants." (*Id.*) Such a policy, which was designed to "erase any hint of unfairness in the hearing process itself" made particular sense, given that claimants were often unrepresented and could "not adequately protect themselves in a judicial like proceeding without the assistance of the ALJ." (*Id.*) If the ALJ failed to assist a claimant, and this resulted in even a minor checklist violation, the Consent Decree was to offer the claimant a remedy. To refuse remedial relief except upon satisfaction of a significantly higher standard would deny relief to many unrepresented claimants and do little to remove "hints" of unfairness which the Consent Judgment sought to eliminate. (*Id.*)

Defendants offer no explanation of the circumstances surrounding the negotiation of the Consent Decree, and instead rely upon recent Appellate Division decisions in which the state court ostensibly approved of defendants' use of an outcome determinative test. However, the cases relied upon by defendants do little more than reflect the standard applied by the Board, and do not involve independent determinations of the appropriate standard by the reviewing court. *See, e.g., Matter of Williams,* 176 A.D.2d 426, 574 N.Y.S.2d 416 (3d Dept.1991); *Matter of Velazquez,* 174 A.D.2d 922, 571 N.Y.S.2d 617 (3d Dept.1991). Further, in these cases, there were *no* procedural errors found, so

---

22. Further, if a review of the merits was required for every class member case, it is not clear what further remedial relief could be offered a claimant if a checklist violation were to be found as well. A claimant presumably would not be entitled to any further relief simply because a procedural violation had occurred, if a review of the merits had already shown whether or not the claimant was or was not entitled to receive benefits.

Plaintiffs also claim that every class member case deserves a merit review "as a way of remedying the gravamen of Plaintiffs' complaints that

there was a pattern and practice of bias against claimants" by the Board. (Pl.Mem.Supp.Mot.Contempt at 39.) However, as defendants correctly point out, the Consent Judgment itself states that it was "entered into by the parties for the purposes of settlement only and nothing [therein] shall constitute an admission or concession of the truth of any allegations made in the complaints." (Consent J. at 4.) Therefore, plaintiffs' bias allegation necessarily remains an allegation alone, and cannot form the basis for remedial action.

that the court had little incentive to question the Board's approach.

Therefore, the court finds that the standard of review proposed by plaintiffs must be adopted by defendants. However, because of the lack of guidance offered by the Consent Decree on this point, the court will not require defendants to apply this standard to those class member cases reviewed prior to the date of plaintiffs' contempt motion, at which time defendants were put on notice of the new standard.[23]

Of significance as well is defendants' claim that they may apply the formula designed to determine the number of class member cases provided for plaintiffs' review, (Consent J. ¶ 43), and so reduce this number from 600 to 50. Both parties agree that to this point it has been the practice to provide 600 files annually since the parties agreed to that number shortly after the implementation of the Consent Judgment.[24]

Defendants do not offer any justification for their desire to use the formula at this time, other than their belief that they provided 600 case files to plaintiffs in their sole discretion, and so had the ability to apply the formula at any time they saw fit to do so. Plaintiffs, in addition to claiming that they have come to rely upon receipt of the 600 case files for their monitoring, maintain that there has never been a "meeting of the minds" as to the formula's application, and vigorously contest defendants' conclusion that the formula requires the provision of only 50 case files per year.

The court believes that both plaintiffs' and defendants' time would be better spent working together to further compliance with the Consent Decree rather than fighting over the meaning of a provision that, in fact, has not been employed for 10 years, and whose substitute (i.e., 600 case files per year) is not

even now claimed to be a particular burden upon defendants. Therefore, despite the court's perplexity at how a provision that neither party evidently understood could be included in the Consent Judgment, given that the parties do not agree on its meaning, the court finds that defendants should continue the practice of providing 600 class member case files to plaintiffs for the duration of the Consent Decree.

## V.

■ Plaintiffs have also asked the court to issue guidelines enabling them to interview ALJs and "other Board employees" regarding ongoing policies and practices of the Board without the presence of defendants' counsel. Recently, the New York State Court of Appeals, in interpreting Disciplinary Rule 7–104(A)(1),[25] established the standard for such a request by refusing to allow opposing counsel to interview informally "employees whose acts or omissions in the matter under inquiry are binding on the corporation (in effect, the corporation's 'alter egos') or imputed to the corporation for purposes of its liability, or employees implementing the advice of counsel." *Niesig v. Team I,* 76 N.Y.2d 363, 374, 559 N.Y.S.2d 493, 498, 558 N.E.2d 1030 (1990); *see also Miano v. AC & R Advertising, Inc.,* 148 F.R.D. 68, 76–77 (S.D.N.Y.) (Katz, J.), *adopted and approved,* 834 F.Supp. 632 (S.D.N.Y.1993) (Sand, J.).

Although plaintiffs try to finesse the issue, the acts of ALJs are imputed to defendants for purposes of liability. The very acts of these ALJs have formed the bases for a number of the Consent Decree violations alleged by plaintiffs in their papers. As plaintiffs have previously written, the 1983 Consent Judgment "impose[d] new requirements upon the Board, its staff and the ALJs." (Pl.Mem.Supp.Proposed Settlement at 43.)

---

23. Plaintiffs also contend that defendants must apply current law when they review the merits of a reopened case. After reviewing defendants' papers, the court does not believe that defendants disagree with this claim. Case law provides that the Board is to apply the law in effect at the time that it renders its decision. *See, e.g., Matter of Abbott,* 136 A.D.2d 868, 524 N.Y.S.2d 527 (3d Dept.1988).

24. The number of class member cases to be provided for plaintiffs' review was agreed to without the use of the formula contained in Consent Judgment ¶ 43, and the formula has yet to be used by the parties.

25. DR 7–104(A)(1) prohibits a lawyer from communicating directly with a "party" who is represented by counsel in a given litigation.

In 1983, then, plaintiffs recognized that the Consent Decree bound ALJs as well as Board staff members. They cannot argue differently at this juncture.

Nor may plaintiffs be heard to claim that the First Amendment rights of ALJs would be violated if they were not permitted to speak with plaintiffs' counsel informally. (Pl.Mem.Supp.Mot.Guidelines at 9.) If some ALJs wish to speak with plaintiffs' counsel alone but, as counsel intimates, fear reprisal if they do so, then those ALJs may retain counsel and maintain an action of their own.

Therefore, plaintiffs' motion with respect to interviewing ALJs is denied. With respect to the "other Board employees" alluded to by plaintiffs, the court denies plaintiffs' motion as well, but gives plaintiffs' leave to re-file if there are specific categories of employees plaintiffs desire to interview. However, plaintiffs should be aware that the court believes, at this point, that the actions of any Board employee (whom plaintiffs would be interested in speaking to) would be imputed to defendants for purposes of liability. Further, any consideration of a renewed motion made by plaintiffs would necessarily include the timeliness of plaintiffs' request, and plaintiffs would need to explain why such a motion was not made prior to the filing of plaintiff's contempt motion.

## VI.

Based upon the foregoing, plaintiffs' motion for contempt is granted. Defendants have consistently ignored their obligations under the Consent Decree, and, in so doing, have sought to nullify the Decree unilaterally. Nevertheless, although such actions justify their imposition, sanctions will not be ordered "unless defendants persist in refusing to accept and adhere to their binding obligation to implement in good faith what was agreed to." *Hurley,* 1993 WL 738455, at 10, 1993 U.S.Dist. LEXIS 10381, at *27. This opinion has clarified defendants' obligations and indicated what actions must cease, and so good faith compliance with the Consent Decree may be forthcoming. If violations continue, however, sanctions will be imposed.

The court finds it necessary to extend the Monitoring Period for two years, at which time the parties shall be expected to comply with the provisions of Stipulation ¶ 1(c) and discuss whether the Period should be extended again.

Further, the court denies plaintiffs' requests for the court to 1) appoint a Special Master, and 2) enjoin the Board from implementing or continuing the increase of any monthly productivity goal for Appeal ALJs and order the creation of a joint plaintiff-defendant study of the impact such an increase would have upon the Consent Decree. Particularly given that the court will not order defendants to institute the computerized monitoring system suggested by plaintiffs and that this Opinion should enhance the prospects for future compliance, the court does not see the need to appoint a Special Master at this time. The court will not interfere with productivity guidelines or order a joint study because the Board is free to manage its operations as it sees fits, so long as it complies with the Consent Decree. The extended Monitoring Period will enable plaintiffs to monitor defendants' performance in this, as well as other, areas.

Plaintiffs are entitled to reasonable attorney's fees, costs and disbursements incurred in connection with the preparation and filing of their contempt motion and three supplemental motions, and to any further relief as provided in this Opinion.

Finally, the papers submitted by the parties have been voluminous, covering hundreds of pages and alleging or denying violations of the Consent Decree that may have occurred as many as ten years ago. Yet, until the filing of plaintiffs' motion, neither party sought guidance from the court in respect of their rights or obligations under the Decree. As a result, it became the court's responsibility to review the parties' claims and counterclaims in order to make sense of roughly a decade's worth of activity. For either party again to wait so long before approaching the court when the parties disagree cannot be the most efficient way to proceed in the future, and the parties, therefore, should take a more active role in resolving issues as they arise. When the proce-

dures outlined in the Consent Decree fail to generate mutually acceptable solutions to such issues, the parties should seek the court's guidance promptly. To initiate this procedure and to advise the court of the progress made on those issues that the Opinion directed should be resolved between themselves, the parties should schedule a conference with the court in no less than thirty, and no more than sixty, days.

**IT IS SO ORDERED.**